STATE OF NEBRASKA EX REL. COUNSEL FOR DISCIPLINE OF THE NEBRASKA SUPREME COURT, RELATOR, V. THOMAS M. PETERSEN, RESPONDENT.

652 N.W.2d 91

Filed October 18, 2002.    No. S-01-741.

Kent L. Frobish, Assistant Counsel for Discipline, for relator.

Jeffrey A. Silver for respondent.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

PER CURIAM.

### NATURE OF CASE

This is an original action brought by the Counsel for Discipline of the Nebraska Supreme Court seeking the imposition of discipline against Thomas M. Petersen, a member of the Nebraska State Bar Association. Petersen was formally charged with violating disciplinary rules and his oath of office as an attorney in connection with his representation of Jennifer Davis, also known as Jennifer Weeks (Weeks). A hearing was held, and the referee found that Petersen engaged in conduct involving dishonesty, fraud, and deceit. The referee recommended that Petersen be suspended from the practice of law for 1 year. Petersen filed exceptions to the referee's report. We reject the referee's determination and dismiss the action.

### BACKGROUND

Petersen was admitted to the practice of law in the State of Nebraska on April 14, 1995. He has been engaged in the private practice of law in Omaha, Nebraska, since that date and at all times relevant to this proceeding. Petersen practices law as the Petersen Law Office and employs attorneys, paralegals, secretaries, and an office manager to assist him in his practice. On February 20, 1998, Weeks retained the Petersen Law Office to represent her in a personal injury claim arising out of an automobile accident. She signed a contingency fee agreement

whereby the Petersen Law Office would receive one-third of all amounts recovered.

Petersen had previously defended Weeks, and she was pleased with his representation. While the personal injury claim was pending, Weeks and her husband, Ray Davis, consulted Petersen about a possible bankruptcy filing. They decided against filing the bankruptcy, and Petersen did not bill them for the consultation.

Weeks' personal injury claim was handled by several different attorneys in the Petersen Law Office. The case was transferred to Tracy Zitnik in early 2000. Zitnik began working for Petersen in December 1999.

On January 28, 2000, the Petersen Law Office received a letter from the insurance company with whom it was negotiating on Weeks' behalf containing a final offer to settle for no more than $7,600. Weeks gave Zitnik the authority to settle for that amount. On March 8, the insurance company sent a memorandum to Zitnik stating that Weeks was responsible for all medical liens. Zitnik had no further contact with Weeks or her claim until March 30 or 31.

According to Weeks, Petersen called her and asked her to come to his office to go over the settlement statement and to sign the necessary release papers. Weeks went to see Petersen on March 25, 2000.

Weeks testified that Petersen showed her a photocopy of the settlement check and had her sign the copy. Petersen went over the settlement statement with her. She did not receive her money that day, as the banks were closed, but was told to come back the following Monday. Petersen told Weeks that he was writing checks for the medical bills, including a check for a bill to the chiropractor at the Natural Health Center, P.C. He told her that he had obtained a reduction of this bill from $3,807.09 to $3,000 and that he was going to try to reduce it even more.

On Monday, March 27, 2000, the settlement check was deposited into the firm's trust account. Also on March 27, the Petersen Law Office issued checks for all disbursements on Weeks' settlement statement except for the disbursement to the Natural Health Center. Five checks were written that day. The checks for attorney fees and costs were deposited into the firm's business account. The checks to the University of Nebraska

Medical Center and to University Medical Associates were retained in Weeks' file.

On Tuesday, March 28, 2000, Petersen further negotiated with the Natural Health Center, which resulted in a reduction of Weeks' bill from $3,000 to $2,500. He instructed the office manager, Matthew R. Samp, to write a check to the Natural Health Center in that amount. Samp wrote check No. 12666 to the Natural Health Center on March 29. Samp thought Weeks owed the firm money for past representation on a driving under the influence (DUI) charge. He asked Petersen about it, and Petersen told him to find the documentation. On March 29, Samp drafted check No. 12665, referencing "Weeks, Jennifer - DWI," payable to the firm for $500. Samp signed the check, copying Petersen's signature, and deposited it into the firm's business account. Samp, however, did not find the necessary documentation to support the issuance of the check.

Lisa M. Samuelson was an employee at the Petersen Law Office during the relevant time period. While she was closing Weeks' file and preparing to send out the medical payments, she noticed that the Natural Health Center bill was $500 less than the corresponding charge stated on the settlement statement. She also observed check No. 12665, or the stub to that check, in the file. She was not aware of the firm's representing Weeks on a DUI charge and took the file to another employee, who stated that there was no DUI file for Weeks. Samuelson then gave the file to Zitnik and notified Zitnik of her concerns.

Zitnik could find no documentation verifying that the Petersen Law Office represented Weeks on a DUI charge. She called Weeks to ask her if the Petersen Law Office had ever represented her on such a charge, and Weeks said no. Despite her awareness of the discrepancies in the file, Zitnik gave the file back to Samuelson to close. Samuelson mailed checks to medical providers and a letter to Weeks, closing the file.

By the time the discrepancy in Weeks' file was brought to Zitnik's attention, Zitnik had decided to leave the Petersen Law Office. She did not give notice that she was going to leave. On April 4, 2000, after Zitnik cashed her paycheck, she went to the Douglas County courthouse and gave her resignation letter to Petersen while he was engaged in a court proceeding.

Before going to the courthouse, Zitnik made a photocopy of Weeks' settlement statement, the check stubs, and the memorandum from Petersen to Samp directing Samp to pay $2,500 to the Natural Health Center. She made notations on the settlement statement and circled the concerns she had. She called Weeks and informed her that she was going to send some documents for Weeks to review. She gave Weeks the name and telephone number for the Assistant Counsel for Discipline. Zitnik encouraged Weeks to file a complaint and indicated that she intended to file a complaint as well.

On April 5, 2000, Weeks received the documents Zitnik sent to her. That same day, Petersen went to Zitnik's new office to discuss why she left. Zitnik told Petersen about how the firm took money for a DUI case that it had not handled. Petersen asked where he could find such information, and she told him to look in Weeks' file. Zitnik had copies of the pertinent documents with her when Petersen was in her office, but did not inform Petersen of that fact.

Petersen then called Samp on his cellular telephone and asked what was happening with Weeks' file. Samp told Petersen about the existence of the $500 check for "Weeks, Jennifer - DWI" in the file. Samp confirmed that he wrote check No. 12665 without documentation. Petersen called Weeks and asked her if the firm had done any other work for her or if she owed the firm any money. She responded no to both questions. He then asked Weeks to come to his office and met with her the same day. After Weeks had arrived at Petersen's office, Petersen again asked her if the firm had performed any other work for her or for Davis. She told him no. Petersen informed Weeks that the Natural Health Center bill had been reduced and that she was owed more money.

Petersen testified that he apologized for the mistake and gave Weeks a check for $760.81, representing the $500 owed and extra money to ensure that she personally recovered more than her attorneys. According to Petersen, it was the policy of the firm to never take more than the client was receiving. On July 5, 2000, the Council for Discipline received a complaint from Weeks regarding Petersen.

A hearing was held in front of a referee, and on October 19, 2001, the report of the referee was released. The referee found

that Petersen had violated Canon 1, DR-102(A)(1) and (4), and his oath of office as an attorney. He recommended that Petersen be suspended from the practice of law for 1 year.

## ASSIGNMENTS OF ERROR

Petersen claims, rephrased, (1) that there is not clear and convincing evidence that he violated DR 1-102(A)(1) and (4) and his oath of office; (2) that his motion to dismiss, based upon the violation of the sequestration order and the changed testimony of Davis, should have been sustained; (3) that the referee erred in his evidentiary rulings; and (4) that the referee erred in recommending a 1-year suspension.

## STANDARD OF REVIEW

A proceeding to discipline an attorney is a trial de novo on the record, in which the Nebraska Supreme Court reaches a conclusion independent of the findings of the referee; provided, however, that where the credible evidence is in conflict on a material issue of fact, the court considers and may give weight to the fact that the referee heard and observed the witnesses and accepted one version of the facts rather than another. *State ex rel. NSBA v. Frederiksen*, 262 Neb. 562, 635 N.W.2d 427 (2001).

Disciplinary charges against an attorney must be established by clear and convincing evidence. *Id.* Clear and convincing evidence means that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *In re Interest of Michael B. et al.*, 258 Neb. 545, 604 N.W.2d 405 (2000).

## ANALYSIS

The referee found that Petersen had violated DR 1-102(A)(1) and (4), and his oath of office. DR 1-102(A) states in pertinent part: "DR 1-102 Misconduct. (A) A lawyer shall not: (1) Violate a Disciplinary Rule. . . . (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." The Counsel for Discipline did not file exceptions to the referee's report.

We disagree with the findings of the referee and find that the Counsel for Discipline did not prove by clear and convincing evidence that Petersen engaged in dishonest, fraudulent, or deceitful conduct. See *In re Interest of Michael B. et al., supra.*

We find that the relevant time period is March 24 to April 5, 2000. It is within this period of time that the crucial events of the case occurred.

Petersen told Weeks that he reduced the Natural Health Center bill from $3,807.09 to $3,000 and that he was going to try to reduce it even further. On March 28, 2000, Petersen was successful in reducing the bill to $2,500. Petersen did not try to keep the reduction a secret from anyone in his office. In fact, Weeks' case file contained both the settlement statement and the check to the Natural Health Center.

Petersen did not attempt to cover up the issuance of check No. 12665, and its issuance did not amount to dishonest, fraudulent, or deceitful conduct on the part of Petersen. The corresponding check stub which listed "Weeks, Jennifer - DWI" was placed in Weeks' case file for anyone who had access to see it. Additionally, the evidence is not sufficient to find that Petersen was aware Samp had even written check No. 12665. Petersen's instruction was clear that Samp was to find the supporting documents and confirm the outstanding balance before issuing a check for payment owed on a possible past representation. At no time did Petersen authorize Samp to issue a $500 check without first locating the documentation to support the claim.

Samp admits that he did not review any of the records before issuing check No. 12665 to the Petersen Law Office, despite the clear directive of Petersen. Petersen did not learn that Samp had issued the check until his conversation with Zitnik on April 5, 2000.

Once Petersen was made aware of what had happened, he took immediate steps to correct the situation. He paid Weeks the money that was owed to her, he relieved Samp of his primary duties as office manager, and he revoked Samp's authority to sign Petersen's name to trust account checks. These actions occurred several months before Weeks filed a complaint with the Counsel for Discipline.

█ We recognize the record suggests that Petersen failed to properly supervise and control his employees and that his office management was sloppy. But, Petersen was not charged for this conduct. Only those matters which are specifically charged in the complaint in disciplinary proceedings can be considered.

See *State ex rel. NSBA v. Kirshen*, 232 Neb. 445, 441 N.W.2d 161 (1989).

We find that the relator has failed to prove by clear and convincing evidence that Petersen violated DR 1-102(A)(1) and (4), and his oath of office.

## CONCLUSION

Because the relator failed to prove by clear and convincing evidence that Petersen engaged in conduct involving dishonesty, fraud, or deceit, we reject the contentions of the Counsel for Discipline and findings of the referee and find that the charges against Petersen should be dismissed.

JUDGMENT OF DISMISSAL.

GERRARD, J., concurring in the result.

I have a markedly different view of what the record establishes about the respondent's conduct, but given the discrepancy between what was charged and what was proved, I reluctantly concur. The operative formal charges in the instant case charged Petersen with violations of Canon 1, DR 1-102(A)(1) (violation of disciplinary rule); DR 1-102(A)(4) (conduct involving dishonesty, fraud, deceit, or misrepresentation); and Canon 7, DR 7-102(A)(5) (knowingly making false statement of law or fact). Petersen's failure to supervise and control the activities of his employees, amply established by the evidence, was negligent and bordered on incompetent, but does not fall within the scope of the allegations or disciplinary rules set forth in the formal charges.

Only those matters which are specifically charged in the complaint in a disciplinary proceeding can be considered. See *State ex rel. Nebraska State Bar Assn. v. Leonard*, 212 Neb. 379, 322 N.W.2d 794 (1982). See, also, *State ex rel. NSBA v. Kirshen*, 232 Neb. 445, 441 N.W.2d 161 (1989) (referee's finding that respondent should be disciplined for failing to supervise employees was error where attorney was not charged with such failure). Had the formal charges specifically accused Petersen, by virtue of his failure to supervise his employees, of engaging in conduct adversely reflecting on his fitness to practice law, see DR 1-102(A)(6), then the result of this proceeding might have been different.

Petersen's poor management of his office and inadequate supervision of Samp, his office manager, could, potentially, subject him to discipline. That Petersen should escape discipline in this proceeding is due solely to the fact that the operative formal charges against him did not raise the issue of Petersen's failure to supervise the conduct of his employees, or charge Petersen with violation of a disciplinary rule pursuant to which such conduct could be punishable.

In his analysis, the referee found that "[Petersen]'s violations arose from disregard for the sanctity of client funds and unprofessional and sloppy office procedures. [Petersen] encouraged office practices which showed no respect for the meaning of a signature, whether it was his or [others]." I agree with the referee's view of the evidence.

The record establishes, beyond reasonable dispute, that Petersen's office management practices were inappropriate for a member of the bar. The record shows that Petersen's signature was routinely " 'replicated' " by his employees on letters and court filings and that Petersen was aware of this practice. Samp also routinely signed Petersen's name to checks drawn on the firm's trust account without Petersen's specific authorization for each transaction. The referee specifically noted that Petersen's office procedures included the "forgery" of Petersen's signature on letters and legal documents, "[w]itnessing" and notarization of clients' signatures by individuals who were not actually present to observe the clients' signatures, and "[f]orgery" of Petersen's signature on checks drawn on the trust account. It was precisely these practices which permitted the issuance of the $500 check to the Petersen Law Office in this case, without verification that the firm was actually entitled to the money.

We have stated that a lawyer's poor accounting procedures and sloppy office management are not excuses or mitigating circumstances in reference to commingled funds. *Kirshen, supra.* An attorney has a duty to supervise the conduct of his or her office and may not escape responsibility to clients by blithely contending that any shortcomings are solely the fault of an employee. See *id.* We have held that a lawyer is ultimately responsible for the conduct of his or her employees and associates in the course of the professional representation of the client. *Id.*

While Petersen in the instant case may have directed Samp to "find the paperwork" relating to the check at issue, Samp's issuance of that check without finding the paperwork was a direct result of established office procedures of which Petersen was aware and which Petersen permitted and even encouraged.

I am convinced, based on the record presented, that Petersen's behavior was inexcusable and may have been unethical. I concede, however, that Petersen's failure to supervise the unacceptable behavior of his employees does not prove, by clear and convincing evidence, any of the disciplinary rule violations that were alleged in the formal charges against him. Thus, I reluctantly concur in the result.

MILLER-LERMAN, J., joins in this concurrence.