STATE OF NEBRASKA EX REL. SPECIAL COUNSEL FOR DISCIPLINE OF THE NEBRASKA SUPREME COURT, RELATOR, V. GLENN A. SHAPIRO, RESPONDENT.

665 N.W.2d 615

Filed July 18, 2003. No. S-01-409.

Jarrod S. Boitnott, Special Counsel for Discipline, of Baylor, Evnen, Curtiss, Grimit & Witt, L.L.P., for relator.

Clarence E. Mock and Denise E. Frost, of Johnson & Mock, for respondent.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

PER CURIAM.

## NATURE OF CASE

On April 9, 2001, amended formal charges were filed against Glenn A. Shapiro by a Special Counsel for Discipline of the Nebraska Supreme Court (relator). The referee recommended dismissal of the amended formal charges. The relator filed exceptions to the referee's report and recommendations.

## FACTS

In March 1999, Manuel Mendoza was arrested in Omaha, Nebraska, on a federal drug conspiracy charge. While incarcerated in the Douglas County jail, he contacted Bobbi Scott and asked her to retain an attorney on his behalf. On March 18, a federal public defender entered an appearance on behalf of Mendoza and represented him at his arraignment. That same day, an attorney in Shapiro's firm appeared at the arraignment of a codefendant of Mendoza's.

On March 19, 1999, Scott called Shapiro at his law office. During that conversation, Shapiro entered into an oral agreement to provide legal representation for Mendoza. Shapiro gave Scott directions to his house, where Scott was to deliver $15,000 in cash the next day. When Scott delivered the cash to Shapiro, she asked for a receipt. Shapiro gave her a handwritten receipt acknowledging that he had received $15,000.

Between March 20 and 22, 1999, Shapiro gathered information concerning Mendoza's case from the U.S. Attorney's office and met with Mendoza at the Douglas County jail. On March 23, Shapiro discovered that he had a conflict of interest because a senior partner in his firm was representing a party who was a codefendant of Mendoza's and a potential witness for the federal government against Mendoza.

Shapiro then contacted Michael Bianchi and referred the case to him. Shapiro asked Bianchi about his fee for representing an individual charged in federal court with taking part in a drug conspiracy. Bianchi responded that his fee was $10,000.

Shapiro and Bianchi subsequently met with Mendoza at the Douglas County jail, where Shapiro told Mendoza that he had a conflict of interest and could not directly represent Mendoza. However, Shapiro told Mendoza he could advise Bianchi as to

the general strategies in a federal drug conspiracy case. Mendoza agreed to be represented by Bianchi.

According to Mendoza, he was not informed as to Bianchi's fee. Shapiro paid Bianchi $10,000 in cash and retained the additional $5,000 paid to him to represent Mendoza. Shapiro believed Mendoza understood that he was keeping the $5,000 for the time he had spent on the case.

Mendoza testified that he learned that Shapiro had retained $5,000 of the initial $15,000 during a conversation with Bianchi in the summer of 1999, which was after Mendoza had been sentenced to federal prison. Mendoza wrote to Shapiro two or three times requesting return of the $5,000. In a letter dated November 3, 1999, Shapiro stated that he felt the $5,000 was earned for the time he had invested and "for the ability for you and/or your lady friend to contact me about the case." Shapiro also questioned why Mendoza had not objected earlier, and he asked Mendoza to write back to "see if we can agree to some compromise that is fair." Shapiro did not return any of the money at that time.

On February 2, 2000, Mendoza again wrote to Shapiro, demanding return of the money. Mendoza also wrote a letter of complaint to the Counsel for Discipline on February 23. A Special Counsel for Discipline was appointed, and Shapiro responded to the complaint on July 24. Shapiro ultimately returned the $5,000 to Mendoza on August 17, 2001.

## FORMAL CHARGES

Formal charges were filed alleging that Shapiro had violated Canon 1, DR 1-102(A)(1) and (4), and Canon 2, DR 2-106(A), DR 2-107(A)(1) and (2), and DR 2-110(A)(3), of the Code of Professional Responsibility.

DR 1-102(A) states in pertinent part that "[a] lawyer shall not: (1) Violate a Disciplinary Rule . . . (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." The relator asserted that Shapiro violated this rule by referring Mendoza to Bianchi under the guise that Shapiro could continue to advise Bianchi as to general strategies despite an acknowledged conflict of interest, by informing Mendoza that Bianchi would be paid the original $15,000 fee without disclosing that Bianchi was charging only $10,000, and by retaining $5,000 of the original fee

without telling Mendoza and without performing services warranting payment of a $5,000 fee.

DR 2-106(A) states that "[a] lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee." The relator asserted that Shapiro violated this rule by retaining $5,000 of the original fee, which is in excess of the fee reasonably and customarily charged in the locality for similar legal services, based on the time, labor, and skill required and the length of the professional relationship with Mendoza.

DR 2-107(A) states in pertinent part:

A lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of his or her law firm or law office, unless:

(1) The client consents to employment of the other lawyer after a full disclosure that a division of fees will be made.

(2) The division is made in proportion to the services performed and responsibility assumed by each.

The relator asserted that Shapiro violated this rule by dividing a fee for legal services with Bianchi, who is not a partner or associate of Shapiro's, and that Shapiro did not make full disclosure to or receive consent from Mendoza. In addition, Shapiro's portion of the fee division was not proportionate to the services he performed and the responsibility he assumed.

DR 2-110(A)(3) states that "[a] lawyer who withdraws from employment shall refund promptly any part of a fee paid in advance that has not been earned." The relator alleged that Shapiro violated this rule when he did not promptly or otherwise refund the part of the fee paid to him in advance that he did not earn when he withdrew as counsel for Mendoza.

## REFEREE'S RECOMMENDATION

In a report filed on September 9, 2002, the referee recommended dismissal of the charges. With respect to the first charge, the referee concluded that "some wrongful purpose or intent to deceive is necessary to make out a violation of DR 1-102(A)(4)" and that Shapiro demonstrated no such intent. The referee found that Mendoza was aware that Shapiro was serving as an advisor on technical matters and that Mendoza wanted Shapiro to remain on the case in some capacity. The referee also found that both

Shapiro and Bianchi believed the arrangement between them could be accomplished without creating any conflict of interest. The referee noted that the charges against Shapiro did not assert that he should be disciplined for acting in an advisory capacity.

The referee found that the evidence was in conflict "as to what Mendoza knew, and when he knew it" in relation to the fee agreement with Bianchi. Shapiro claimed that Bianchi told Mendoza he was receiving $10,000 to take over the case and that, therefore, it could be inferred that Mendoza was aware of Shapiro's retention of $5,000.

The referee noted that although Mendoza denied that he was told about the $10,000 agreement with Bianchi, and Bianchi had no recollection of advising Mendoza of his fee, the referee credited the testimony of Shapiro and found that, at the very least, "Mendoza knew of the actual fee arrangement with Bianchi, and therefore, by clear inference, knew that Shapiro had retained $5,000 of the original $15,000 payment."

The referee noted that Bianchi testified that Shapiro told Mendoza he could not take any direct action in the case, such as filing pleadings, talking to Mendoza, or going to court for Mendoza, but he could discuss the case with Bianchi. The referee found that Mendoza was satisfied with that arrangement.

The referee concluded that the evidence failed to prove by clear and convincing evidence that Shapiro engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation intending to deceive Mendoza or that Mendoza was deceived by any conduct, misrepresentation, or omission by Shapiro in violation of DR 1-102(A)(4). The referee recommended dismissal of the first charge.

Regarding the second charge, the referee concluded that the evidence did not establish that a $5,000 fee for consultation on a multidefendant federal drug conspiracy in which the penalties are 10 years to life in prison was excessive or unreasonable. The fee agreement provided that Shapiro would be available for consultation. The referee called this a retainer fee, "which is generally considered earned when paid." Although Shapiro should have considered a refund based on the fact that no services were ultimately provided, the referee noted that Shapiro eventually refunded the entire fee when he was under no legal obligation to

do so. The referee concluded that the relator did not prove by clear and convincing evidence that Shapiro charged an excessive fee in violation of DR 2-106(A), and the referee recommended dismissal of the second charge.

The third charge asserted that the fee agreement between Shapiro and Bianchi was an improper division of fees among lawyers. The referee stated that he did not need to resolve the issue of whether there was full disclosure and a reasonable division because he found that there was no division of fees within the meaning of DR 2-107.

The referee opined that DR 2-107 prohibits a lawyer who refers a legal matter to another lawyer from receiving a portion of the fee paid to the referred lawyer. An exception allows such a division of fees with the client's consent, as long as the division of fees is based on a division of the services provided. The referee noted that in this case, Bianchi testified that he was not part of any referral arrangement with Shapiro and that he did not pay a referral fee to Shapiro or divide his fees with Shapiro. Shapiro did not share his fee with Bianchi, but, rather, he paid Bianchi the agreed-upon fee to take over the case when Shapiro withdrew.

The referee found that the evidence established there were three fee agreements: (1) between Mendoza and Shapiro in which a third party paid Shapiro $15,000 to represent Mendoza, (2) between Mendoza and Bianchi when Bianchi replaced Shapiro as Mendoza's attorney and Mendoza agreed to pay Bianchi $10,000, and (3) between Shapiro and Mendoza for Shapiro to remain on the case to consult on nonsubstantive matters for the $5,000 which Shapiro had already received as part of the initial payment.

The referee determined that Shapiro and Bianchi did not share a fee within the meaning of DR 2-107 and that it was difficult to conclude that either should have construed their conduct to implicate DR 2-107. The referee found there was a failure to prove by clear and convincing evidence that the lawyers divided fees in violation of the rule. The referee recommended dismissal of the third charge.

The fourth charge alleged that Shapiro failed to promptly refund the fee in violation of DR 2-110(A)(3) when he failed to refund the unearned portion of the fee after he withdrew from

employment. The referee stated that he had already concluded that the $5,000 fee retained by Shapiro related to a new fee agreement between Mendoza and Shapiro after he withdrew from representing Mendoza on the drug conspiracy charge. The referee found there was no evidence that the fee was excessive or that Shapiro withdrew from consulting on the case after Bianchi took over the defense. The referee found that DR 2-110(A)(3) was not implicated by the facts of the case, and he recommended dismissal of the charge.

The referee concluded that the evidence was insufficient to establish each of the material elements of the formal charges by clear and convincing evidence, and he recommended dismissal of all charges.

The relator generally took exception to each of the legal conclusions and findings of fact contained in the referee's report and recommendation.

## STANDARD OF REVIEW

A proceeding to discipline an attorney is a trial de novo on the record, in which the Nebraska Supreme Court reaches a conclusion independent of the findings of the referee; provided, however, that where the credible evidence is in conflict on a material issue of fact, the court considers and may give weight to the fact that the referee heard and observed the witnesses and accepted one version of the facts rather than another. *State ex rel. NSBA v. Gallner*, 263 Neb. 135, 638 N.W.2d 819 (2002).

## ANALYSIS

In accordance with our standard of review, we will analyze each of the charges de novo on the record and reach our conclusion independent of the findings of the referee. All conclusions of law will be decided independently of the determination made by the referee.

## DR 1-102(A)(4)

DR 1-102(A) states that "[a] lawyer shall not: . . . (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." In summary, the relator alleges that Shapiro misrepresented his ability to serve as Mendoza's attorney in order to keep $5,000 of the $15,000 fee he had been paid by Scott.

The referee concluded that Nebraska law requires evidence of a lawyer's intent to commit acts of dishonesty, fraud, deceit, or misrepresentation to prove a violation of DR 1-102(A)(4). The referee found that Shapiro's actions in offering to consult on the case were not dishonest, fraudulent, deceitful, or an intentional misrepresentation of fact intended to deceive Mendoza. As to whether Mendoza knew about the fee agreement between Shapiro and Bianchi, the referee found that the evidence was in conflict. Shapiro stated that he believed Mendoza understood he would retain $5,000. Mendoza claimed that he was not told the specific amount each attorney would receive.

The relator argues that the plain language of DR 1-102(A)(4) does not require intent as an element to prove a violation, whereas other disciplinary rules specifically include intent, i.e., Canon 7, DR 7-101(A), of the Code of Professional Responsibility, which states that a lawyer shall not intentionally take certain actions.

This court has not previously held that intent is an element of a violation of DR 1-102(A)(4); however, other states have considered the question. The Oregon Supreme Court has stated: " 'Misrepresentation' may include an affirmative misstatement, an intentional failure to disclose material facts that may or may not have been intended to deceive, or a combination of both." *In re Conduct of Huffman*, 331 Or. 209, 215, 13 P.3d 994, 998 (2000). The Oregon court has also noted that its version of DR 1-102(A)(4) "focuses on the effect of the lawyer's conduct, not on the lawyer's intent." *In re Stauffer*, 327 Or. 44, 59, 956 P.2d 967, 976 (1998). In Illinois, the Supreme Court has held that intent to defraud or to deceive is not an element of a violation of Illinois' version of DR 1-102(A)(4). See *In re Gerard*, 132 Ill. 2d 507, 548 N.E.2d 1051, 139 Ill. Dec. 495 (1989).

The Iowa Supreme Court has held: "[A] lawyer should conduct himself in his professional capacity with honesty and truthfulness, and should avoid statements or actions that are *calculated to deceive or mislead*." (Emphasis supplied.) *Committee on Professional Ethics v. Hurd*, 325 N.W.2d 386, 390 (Iowa 1982).

We conclude that proof of actual intent to deceive or defraud is not required to demonstrate a violation of DR 1-102(A)(4). The focus of the inquiry is on the effect of the lawyer's conduct, not on the lawyer's intent. Although we find that evidence of intent is

not required, our inquiry does not end there. We must review the evidence to determine whether Shapiro violated DR 1-102(A)(4).

Shapiro's conduct demonstrated misrepresentation. When Shapiro learned of the conflict of interest, he should have immediately withdrawn from such representation and refunded the fee. Instead, Shapiro told Mendoza that Bianchi would be paid from the original $15,000 fee but did not disclose that Bianchi was charging only $10,000. Shapiro retained $5,000 of the original fee without telling Mendoza that he was doing so.

Bianchi testified that he was asked by Shapiro to represent Mendoza in a federal drug conspiracy case. Bianchi said he was told by Shapiro that his fee for such cases was $15,000. Bianchi testified he told Shapiro he would take the case for his usual fee of $10,000. When Bianchi and Shapiro met with Mendoza at the Douglas County jail, Shapiro explained to Mendoza that he could no longer represent Mendoza and that he was referring the case to Bianchi if Mendoza agreed.

Bianchi said Mendoza expressed concern that Shapiro was no longer going to represent him. Bianchi testified that Mendoza asked if Shapiro could "at least keep tabs on the case, maybe provide general strategy or advice." Bianchi said Shapiro explained to Mendoza that he could not file any pleadings for him, could not talk to him, and could not go to court for him but that Shapiro could talk to Bianchi about the case if Mendoza agreed. This conversation occurred at a time when Shapiro knew that a senior partner in his firm was representing a codefendant who might possibly be a witness against Mendoza in the federal drug conspiracy case.

The evidence does not establish that either Bianchi or Shapiro told Mendoza the amount of Bianchi's fee. Bianchi testified that Shapiro told Mendoza, "I'll take care of Mike with the money that you have paid me." Bianchi testified that Shapiro gave him $10,000 in cash on March 23 or 24, 1999, at Shapiro's home. Bianchi testified that Shapiro said he was going to keep the remaining $5,000 and that he asked Bianchi if he had a problem with Shapiro's keeping the money. Bianchi said the matter was between Shapiro and Mendoza. Bianchi said he may have kept Shapiro informed about the case, but Shapiro did not have any input as to the strategies utilized in the case.

Bianchi testified that it was not until after Mendoza had entered his guilty plea, but prior to sentencing, that he and Mendoza discussed the fee arrangement. Bianchi said that Mendoza asked him how much money Shapiro had given him, and he answered $10,000. Mendoza asked about the other $5,000, and Bianchi said Shapiro had kept it. When Mendoza expressed dissatisfaction, Bianchi told him to contact Shapiro to straighten it out.

Bianchi testified that following this conversation, he told Shapiro that Mendoza was upset about the $5,000 and might contact him. Bianchi testified that Shapiro responded that Mendoza was "just a disgruntled client who was not happy with the fact that he was going to be doing an extensive amount of time in a federal prison." Bianchi testified that Shapiro said he did not intend to refund the money. At some later time, Shapiro told Bianchi he was considering giving half of the money back to Mendoza.

Shapiro testified that he was first contacted by Scott on March 18, 1999, and that he told her he required a $15,000 retainer. He said that Scott came to his office on March 18 or 19 and gave him $15,000 in cash and that they reached an oral agreement for Shapiro to represent Mendoza through trial and sentencing. In contrast to Scott's testimony about a receipt, Shapiro stated that he was not sure whether he provided Scott with a receipt because it was his practice to prepare one only if requested by the client.

Shapiro said he met with Mendoza on March 19, 1999, at the Douglas County jail, where he told Mendoza he had received $15,000 from Scott. Shapiro testified that at a later meeting, Mendoza gave him permission to discuss his case with Scott. Shapiro said he and Mendoza met four times. During the third meeting, on March 23, Shapiro informed Mendoza of the conflict of interest and that he would need to withdraw. Shapiro said Mendoza asked if he could stay on the case if Mendoza paid additional money. Shapiro explained that rules prevented him from representing Mendoza. Shapiro told Mendoza he would see if he could arrange to continue with the case in federal court if Mendoza waived any claim concerning a conflict of interest.

Shapiro said his final meeting with Mendoza was on March 24, 1999, when they met with Bianchi. Shapiro said he told Mendoza that he could provide general answers on his case. Shapiro said that during this meeting, Mendoza asked Bianchi

about his fee. Shapiro said Mendoza knew that Shapiro had $5,000 left over from the money paid by Scott. Based on his conversation with Mendoza, Shapiro said he believed Mendoza was going to allow him to keep the $5,000 for the time he had invested and so that he would be available for Scott if she needed legal assistance in the future. Thus, it is Shapiro's position that part of the $5,000 was earned and part was retained for future services for Mendoza or Scott for matters unrelated to the federal indictment. Shapiro testified that Scott was his client under the retainer agreement with Mendoza.

In a deposition, Mendoza stated that he was sentenced to a term of 14 years in prison for conspiracy to possess and distribute methamphetamine. He stated that he asked his friend, Scott, to find a lawyer and that she retained Shapiro. Mendoza stated that Shapiro told him at their first meeting that the fee was $15,000. Mendoza said he assumed the $15,000 covered all expenses and fees because he had no specific discussion about it with Shapiro. They had no written agreement, and Mendoza stated that he had no agreement with Shapiro to do additional work for Scott. Mendoza said he met Bianchi at his second meeting with Shapiro, where Shapiro told Mendoza about the conflict with his firm's representing a codefendant.

Mendoza testified that Shapiro told him he was free to pick another lawyer, but that if he retained Bianchi, Shapiro would "watch over" the case and provide help. Shapiro then left so Mendoza and Bianchi could talk. Mendoza said he never talked to Shapiro about Bianchi's fee or how he was going to be paid. Mendoza said he "figured" that Shapiro would get some of Bianchi's fee because Shapiro had referred Bianchi. When Bianchi met with Mendoza at the federal prison in Leavenworth, Kansas, Mendoza asked Bianchi about his fee because Mendoza was considering firing Bianchi. Mendoza said that that was the first time he learned that Bianchi's fee was $10,000 and that Shapiro had retained $5,000. Mendoza said that at one point, he told Bianchi to tell Shapiro he could keep $1,000 and should send $4,000 to Mendoza's family. Mendoza said he was willing to give Shapiro $1,000 because he did not want any more problems, and he "figured a thousand was more than enough for the two times that he went to visit me that took up his time."

We find that the evidence demonstrates clearly and convincingly that Shapiro misrepresented his financial agreement with Mendoza. When Shapiro learned that he had a conflict of interest in representing Mendoza, he could not charge Mendoza for work performed after he knew or should have known of the conflict of interest. Shapiro could not represent to Mendoza that he could continue to serve as an advisor on technical matters when Shapiro's partner was representing a codefendant who could testify against Mendoza.

Numerous ethical conflicts would be presented in this situation. Shapiro's disqualification existed before he agreed to represent Mendoza. His partner was representing a codefendant who might possibly testify against Mendoza. Therefore, Shapiro could not continue to represent Mendoza. Such representation would clearly be adverse to Mendoza, and such representation would potentially be adverse to the codefendant who was being represented by Shapiro's partner.

Shapiro's right to any fee terminated no later than March 23, 1999, when he knew of the conflict of interest. The record clearly and convincingly demonstrates that Shapiro knowingly agreed to continue in some type of representative capacity in order to keep the entire $5,000. The record does not establish that Mendoza knew that Shapiro was going to keep $5,000 of the fee or that he consented to such an arrangement. We do not accept Shapiro's claim that part of the fee was for work done for Mendoza and part of the fee was for Shapiro to serve as an advisor on technical matters or to advise Scott in the future.

We have previously held:

> We do not accept the contention that an attorney can receive fees for representation which from the outset gives the appearance of impropriety and is violative of established rules of professional conduct. An attorney may not recover for services rendered if those services are rendered in contradiction to the requirements of professional responsibility and inconsistent with the character of the profession.

*State ex rel. FirsTier Bank v. Mullen*, 248 Neb. 384, 390, 534 N.W.2d 575, 580 (1995), citing *Eriks v. Denver*, 118 Wash. 2d 451, 824 P.2d 1207 (1992); *In re Estate of McCool*, 131 N.H. 340,

553 A.2d 761 (1988); and *Moses v. McGarvey*, 614 P.2d 1363 (Alaska 1980).

In *In re Estate of Watson*, 5 Neb. App. 184, 189, 557 N.W.2d 38, 41 (1996), the Court of Appeals noted: "Many courts have held that once a conflict of interest or other ethical violation has been established, the attorney is prohibited from collecting fees for his or her services." The Court of Appeals stated: "[A]n attorney who performs work, despite a conflict of interest, is generally prohibited from recovering any fees for the work." *Id.* at 190, 557 N.W.2d at 42. The general principle holds that "once a conflict of interest has been established, an attorney is prohibited from recovering fees for his services, regardless of any benefit to the client." *Id.* at 191, 557 N.W.2d at 42. The Court of Appeals concluded: "[A]n attorney who has a conflict of interest of which he or she knew, or should plainly have known, may not receive attorney fees for legal services rendered to a client after acquiring such knowledge." *Id.* at 193, 557 N.W.2d at 43. Shapiro's conflict of interest existed before he agreed to represent Mendoza, and he discovered the conflict 3 days after he began the representation.

Other courts have addressed the issue of whether an attorney may charge a fee when a conflict of interest exists. In *Pessoni v. Rabkin*, 220 A.D.2d 732, 633 N.Y.S.2d 338 (1995), the court held that an attorney whose representation of multiple parties created a conflict of interest was not entitled to legal fees for services rendered. In *Rice v. Perl*, 320 N.W.2d 407 (Minn. 1982), the court held that the law firm forfeited its attorney fees for failing to disclose to the client-plaintiff its ongoing relationship with the defendant's claims adjuster who was negotiating with the plaintiff. In *White v. Roundtree Transport, Inc.*, 386 So. 2d 1287 (Fla. App. 1980), the attorney's right to a fee terminated when the attorney realized or should have realized that he could not ethically represent the client's interests.

Disciplinary charges against an attorney must be established by clear and convincing evidence. *State ex rel. Counsel for Dis. v. Petersen*, 264 Neb. 790, 652 N.W.2d 91 (2002). Clear and convincing evidence means that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *Id.* From our de novo review of

the record, we conclude that the evidence shows clearly and convincingly that Shapiro violated DR 1-102(A)(1) and (4).

## DR 2-106(A)

The second charge against Shapiro alleged that he violated DR 2-106(A), which states that "[a] lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee." The relator asserted that Shapiro violated this rule by retaining $5,000 of the original fee, which is in excess of the fee reasonably and customarily charged in the locality for similar legal services, based on the time, labor, and skill required and the length of the professional relationship with Mendoza.

In recommending dismissal of this charge, the referee stated that there was no evidence to establish that a $5,000 fee for consultation on a multidefendant federal drug conspiracy in which the penalties are 10 years to life in prison is excessive or unreasonable. According to the referee, the fee agreement contemplated that Shapiro would be available for consultation. The referee concluded that the relator did not prove by clear and convincing evidence that Shapiro charged an excessive fee in violation of DR 2-106(A). We disagree.

■ This court has held that a fee is clearly excessive "when, 'after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee.'" *State ex rel. NSBA v. Miller*, 258 Neb. 181, 192, 602 N.W.2d 486, 496 (1999).

Shapiro kept $5,000 of the $15,000 fee paid to him by Scott. The only testimony concerning the appropriateness of that fee was offered by Sean Brennan, a criminal defense attorney with nearly 20 years of experience in the field. Brennan stated that in his opinion, if an attorney receives a $15,000 fee up front from a client in a federal drug conspiracy case, the fee is earned as services are provided unless the client is told that it is a flat fee retainer and that it is not refundable. According to Brennan, the lawyer should place the retainer in a trust account and bill against the retainer on an hourly basis. If the client is clearly told that the money is a nonrefundable retainer, the attorney may place the funds in a business account. However, Brennan said the situation must be made clear to the client.

The record shows that between the time Shapiro was hired and the time he learned of the conflict, he worked approximately 10 hours on behalf of Mendoza. After the discovery of the conflict, Shapiro had no right to represent or charge Mendoza for work done after that time. The $5,000 fee for the work performed prior to knowledge of the conflict is excessive and a violation of DR 2-106(A).

## DR 2-107(A)

The third charge alleged that Shapiro violated DR 2-107(A)(1) and (2), which prohibits division of fees. The relator asserted that Shapiro violated this rule by dividing a fee with Bianchi without making full disclosure to or receiving consent from Mendoza. The relator also alleged that Shapiro's portion of the fee was not proportionate to the services he performed and the responsibility he assumed.

The referee recommended dismissal of this charge, finding no division of fees within the meaning of DR 2-107(A)(1). The referee noted that an exception is allowed when the client consents and if the division of fees is based on a division of the services provided. The referee noted that Bianchi testified that he was not part of any referral arrangement with Shapiro and that he did not pay a referral fee to Shapiro or divide his fees with Shapiro. The referee stated that Shapiro did not share his fee with Bianchi, but, rather, Shapiro paid Bianchi the agreed-upon fee to take over the case when Shapiro withdrew. The referee found that the lawyers did not share a fee within the meaning of DR 2-107(A)(1) and that the relator failed to prove by clear and convincing evidence that the lawyers divided fees in violation of the rule.

We conclude that the referee was incorrect in finding no violation of DR 2-107(A)(1). Bianchi testified that Shapiro told him the fee for such a case was $15,000. Bianchi told Shapiro he would take the case for his usual fee of $10,000. Bianchi testified that Shapiro gave him $10,000 in cash, said he was going to keep the remaining $5,000, and asked Bianchi if he had a problem with that. Bianchi responded that the matter was between Shapiro and Mendoza. Bianchi said he may have kept Shapiro informed about the case, but Shapiro did not have input as to the strategies utilized in the case. From our de novo review of the

record, we find that it was Shapiro who divided the fee. He kept $5,000 and gave Bianchi $10,000 without making a full disclosure of the arrangement or obtaining Mendoza's consent to do so. This arrangement was a violation of DR 2-107(A)(1) and (2).

## DR 2-110(A)(3)

The fourth charge alleged that Shapiro violated DR 2-110(A)(3) by failing to promptly refund the $5,000 when he withdrew as counsel for Mendoza. Because the referee concluded that the $5,000 fee retained by Shapiro related to a new fee agreement between Mendoza and Shapiro after he withdrew from representing Mendoza on the drug conspiracy charge, the referee found that there was no evidence that the fee was excessive and that Shapiro never withdrew from consulting on the drug conspiracy case after Bianchi took over Mendoza's defense. The referee found that DR 2-110(A)(3) was not implicated by the facts of this case.

We disagree. Shapiro, upon learning of his conflict of interest, failed to promptly refund the unearned portion of the fee. In fact, Shapiro did not refund the fee until August 17, 2001, which was more than 2 years after Mendoza asked for the refund. DR 2-110(A)(3) states that "[a] lawyer who withdraws from employment shall refund promptly any part of a fee paid in advance that has not been earned." Shapiro violated DR 2-110(A)(3) when he failed to promptly refund the unearned portion of the fee.

## DISCIPLINARY SANCTION

We have determined that Shapiro violated DR 1-102(A)(1) and (4), DR 2-106(A), DR 2-107(A)(1) and (2), and DR 2-110(A)(3). To determine whether and to what extent discipline should be imposed in a lawyer discipline proceeding, we consider the following factors:

> (1) the nature of the offense, (2) the need for deterring others, (3) the maintenance [of the] reputation of the bar as a whole, (4) the protection of the public, (5) the attitude of the respondent generally, and (6) the respondent's present or future fitness to continue in the practice of law.

*State ex rel. Counsel for Dis. v. Thompson*, 264 Neb. 831, 842, 652 N.W.2d 593, 601 (2002). Each case must be evaluated individually in light of its particular facts and circumstances. *Id.* For

purposes of determining the proper discipline of an attorney, this court considers the attorney's acts both underlying the events of the case and throughout the proceeding. *Id.*

Shapiro agreed to represent Mendoza and accepted $15,000 to do so. Upon learning of a conflict of interest, Shapiro represented to Mendoza that he could continue in an advisory capacity when he should have promptly withdrawn. Shapiro instead contacted another attorney, who agreed to represent Mendoza for $10,000. Without advising Mendoza of the fee arrangement, Shapiro kept $5,000 of the $15,000 fee. The retention of the $5,000 was an excessive fee. He had not earned the $5,000 because he learned of the conflict of interest 3 days after he was initially paid the $15,000 fee. The unearned portion should have been promptly returned when Shapiro learned that his partner was representing a codefendant who might testify against Mendoza. He did not refund the $5,000 until after formal charges had been filed against him, which was more than 2 years after he had withdrawn as Mendoza's attorney.

██ This court must impose a disciplinary sanction to deter others from misconduct in order to protect the public and to maintain the reputation of the bar as a whole. *State ex rel. Counsel for Dis. v. Huston,* 262 Neb. 481, 631 N.W.2d 913 (2001). We conclude that Shapiro should be suspended from the practice of law in the State of Nebraska for a period of 60 days, effective immediately.

## CONCLUSION

It is the judgment of this court that Shapiro should be suspended for a period of 60 days, effective immediately. He is directed to comply with Neb. Ct. R. of Discipline 16 (rev. 2000), and upon failure to do so, he shall be subject to punishment for contempt of this court. In addition, Shapiro is directed to pay costs and expenses in accordance with Neb. Rev. Stat. §§ 7-114 and 7-115 (Reissue 1997) and Neb. Ct. R. of Discipline 23(B) (rev. 2001).

JUDGMENT OF SUSPENSION.