674 N.W.2d 464 (2004)
267 Neb. 328
State of NEBRASKA ex rel. COUNSEL FOR DISCIPLINE OF the NEBRASKA SUPREME COURT, Relator
v.
Donald R. JANOUSEK, Respondent.
No. S-02-920.
Supreme Court of Nebraska.
January 30, 2004.
*467 John W. Steele, Assistant Counsel for Discipline, for relator.
Donald R. Janousek, pro se.
HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
PER CURIAM.
Donald R. Janousek, the respondent, engaged in several instances of stalking and harassing his former girl friend. The sole issue presented in this appeal is the appropriate sanction to be imposed for Janousek's conduct.

SCOPE OF REVIEW
A proceeding to discipline an attorney is a trial de novo on the record, in which the Nebraska Supreme Court reaches a conclusion independent of the findings of the referee. State ex rel. Counsel for Dis. v. James, ante, 267 Neb. p. 186, 673 N.W.2d 214 (2004). However, Janousek did not file an exception to the referee's report, and the sole exception filed by the Counsel for Discipline is that the 2-year sanction recommended by the referee is too lenient. Therefore, the scope of our review is limited to the determination of appropriate discipline.

FACTUAL BACKGROUND
Janousek was admitted to the practice of law in Nebraska in 1977, and he practiced law in Loup City and Ord before moving to Omaha in 2001. Janousek has been the subject of previous disciplinary actions and was privately reprimanded in 1990, 1994, and 1997, although the circumstances in those cases are not similar to the allegations made by the complainant in this case.
The complainant, an African-American mother of two boys, met Janousek socially in 1998, and the complainant and Janousek began dating. In 2000, Janousek represented the complainant briefly in a legal dispute between the complainant and her ex-husband, but when the complainant's ex-husband objected to Janousek's representing the complainant at the same time he was dating her, Janousek withdrew from the case and recommended another attorney to the complainant. The complainant ended her relationship with Janousek in July 2001.
The complainant had lent Janousek money to pay his bar association dues and asked Janousek to repay the money. Janousek responded by denying the debt, using racial slurs, and threatening, in the complainant's words, to "bombard my mailbox with unpleasant things every day and he would drag me to court and he would keep me poor by having me go to court and use my [medical] leave that I needed."
Janousek sent the complainant a letter, dated July 31, 2001, in which he expressed affection for the complainant and apologized for his prior behavior. Janousek acknowledged the debt and promised to pay it back by October 1 at the latest. However, the complainant eventually had to take Janousek to small claims court to recover the debt.
Janousek continued to try to contact the complainant after the July 31, 2001, letter. The complainant received numerous telephone calls, and Janousek also called the complainant's sisters. Janousek came to *468 the complainant's place of work and "boxed [her car] in [with] his car" in the parking lot for "at least half an hour" before some workmen leaving the building prompted Janousek to leave. The complainant obtained a protection order, which Janousek violated. On August 14, Janousek stood outside the complainant's home, pounding and yelling for "at least 45 minutes" before police arrived. Janousek was convicted, pursuant to a no contest plea, of violation of the protection order.
The complainant testified that the day after the protection order issued, she received notice of a lawsuit filed by Janousek, purportedly to recover $10,000 in unpaid legal fees. Janousek asserts this was a counterclaim, not a separate lawsuit. The complainant testified that Janousek's claim was "bogus," because Janousek always demanded to be paid in advance for legal work and the complainant had retained her receipts. The claim was eventually dismissed by Janousek.
The record contains four letters that are particularly important to our disposition of this case, three signed with the complainant's name, and the fourth addressed to the complainant purportedly from the "White Aryan Resistance." The complainant denied writing any of the letters that were signed with her name. All four letters were found by the referee to have been authored and sent by Janousek, and Janousek, appearing pro se, admitted at oral argument that he was responsible for sending the letters.
The letter sent to the complainant from the "White Aryan Resistance" was postmarked September 4, 2001. Because the appalling racist content and threatening overtones of this letter are important to our determination in this case, it is set forth below in its entirety, except that the name of the complainant is omitted:
Dear Mrs. Negro....
In case you're too dumb to notice by now, you ARE being watched. We see it as our duty to keep watch on undesirables in our neighborhoods. You must know why you would be an undesirable.
We keep an eye on where you live, where you work and the college you go to a couple of nights a week. We are hoping that you will just pack up and move back to wherever you came from. Go back and get some of that big jungle cock you colored women crave so much and leave our White men alone.
You might be trying to live White, but you never will be.
Our neighborhood will be much better after you move out. We have not seen those two young thugs of yours around for awhile. Good.
Rememberyou are being watched. Every car in back of you could be one of us. Every phone call could be one of us. By the wayyour bed looked better with the curved wood headboard. Wear less when you're typing in the basement. Why aren't you sleeping much in your bedroomthat big black ass of yours really is something in the moonlight. It should make some jungle bunny real happy.
We'll see you around. Did you know the lock on your patio screen door needs fixin'?
The complainant testified that the details of her home mentioned in the letter, such as the broken patio door, were accurate and were known to Janousek. The complainant testified that Janousek was aware that her sons had previously lived with her, but had moved in with their father. The complainant also testified that
one of the phone calls I'd gotten from [Janousek] was that he knew where I slept and that, you know, he could shoot through the window. Something *469 the gist of it was that, yeah, you know, be careful where you sleep. He knew where the bedroom was, and I was really frightened because he had been in Vietnam, he knew how to work a gun. And yeah, my head was rightyou could shoot through the window and hit me.
Attached to the letter was a photocopied pornographic picture, depicting a man ejaculating in the mouth of a black woman. Underneath the picture was the handwritten caption, "Bet this makes you hungry!" The complainant testified that although the woman in the picture was not the complainant, the woman resembled the complainant.
The next letter, also postmarked September 4, 2001, was sent to Janousek's former attorney and was signed with the complainant's name. That attorney had represented Janousek in the protection order case, and the complainant had been upset by some of the attorney's cross-examination of the complainant when she testified on the matter. The letter accused the attorney of being "mentally disturbed." The letter also contained vaguely threatening language, telling the attorney that she would "need to watch your step from here on" and stating that "[Janousek] found out what happens when people mess with me and you will, too."
The third letter, dated September 3, 2001, was sent to the complainant's attorney and was signed with the complainant's name. The complainant's attorney had been recommended to the complainant by Janousek after he withdrew from representing the complainant. The letter told the complainant's attorney that she should conclude the complainant's case immediately, that "I have paid you more than enough for what little work I have seen," and that the complainant would no longer pay her attorney fees. The complainant found out about the letter when her attorney attempted to withdraw from representing her.
The final letter was postmarked September 4, 2001, and was sent to the registrar's office of the complainant's graduate school. The letter, again signed with the complainant's name, informed the registrar that the complainant wanted to immediately withdraw from her master's degree program and all her classes because she was moving out of town and getting married. The complainant found out about the letter only when the director of the program congratulated the complainant on her upcoming wedding.
The complainant also described an incident that occurred on September 11, 2001, for which she believed Janousek was responsible. The complainant's sister lived in New York, and Janousek was aware of that fact. On September 11, the complainant received a message at work that a public relations person from a New York hospital was trying to reach the complainant and that the complainant needed to return the call right away. The complainant tried to call the hospital but was unable to get through for some time. When the complainant finally reached the hospital, she found that no one had called her workplace and that the message she had received was a hoax.

PROCEDURAL HISTORY
The complainant filed a grievance with the office of the Counsel for Discipline on September 26, 2001. Janousek did not respond to inquiries from the Counsel for Discipline that were sent to him on November 28, 2001, and January 7 and March 28, 2002. Formal charges were filed on August 19, 2002, alleging that the letters sent by Janousek, as described above, constituted violations of Janousek's oath of office, see Neb.Rev.Stat. § 7-104 (Reissue *470 1997), and Canon 1, DR 1-102(A), of the Code of Professional Responsibility, which provides in relevant part:
A lawyer shall not:
(1) Violate a Disciplinary Rule.
. . .
(3) Engage in illegal conduct involving moral turpitude.
(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
(5) Engage in conduct that is prejudicial to the administration of justice....
(6) Engage in any other conduct that adversely reflects on his or her fitness to practice law.
On February 19, 2003, Janousek filed an answer to the formal charges, generally denying the allegations made regarding the letters described above. Janousek explained to the Counsel for Discipline that he had moved and suffered from health problems that had prevented him from timely responding to inquiries from the office of the Counsel for Discipline. The Counsel for Discipline accepted this explanation and dismissed the formal charges with respect to Janousek's failure to cooperate with the investigation.
A referee was appointed, and a hearing was held. The evidence adduced at the hearing is summarized above. Janousek refused at that time to either admit or deny sending the letters, citing a fear of criminal prosecution, but did admit generally that he had "for about three weeks behav[ed] like a total jackass." Janousek expressed remorse for his behavior. At oral argument, Janousek personally admitted responsibility for sending the letters.
The referee concluded that Janousek had sent the letters described above and that this conduct constituted violations of his oath as an attorney and DR 1-102(A). The referee, noting Janousek's three prior reprimands, recommended a 2-year suspension from the practice of law.

EXCEPTION
The Counsel for Discipline takes exception to the recommended sanction of a 2-year suspension, arguing that disbarment is the appropriate discipline. Janousek does not take exception to the referee's report.

ANALYSIS
As previously stated, a proceeding to discipline an attorney is a trial de novo on the record, in which the Nebraska Supreme Court reaches a conclusion independent of the findings of the referee. State ex rel. Counsel for Dis. v. Mills, ante, 267 Neb. p. 57, 671 N.W.2d 765 (2003). However, the sole issue presented to this court is the appropriate discipline to be imposed, and neither party has taken exception to the factual findings of the referee. When no exceptions to the referee's findings of fact are filed by either party in a disciplinary proceeding, the court may, at its discretion, adopt the findings of the referee as final and conclusive. Id.
To sustain a charge in a disciplinary proceeding against an attorney, the charge must be established by clear and convincing evidence. State ex rel. Counsel for Dis. v. James, ante p. 186, 673 N.W.2d 214 (2004). Based upon our review of the record and the undisputed findings of the referee, we conclude that the above-referenced facts have been established by clear and convincing evidence. Based on that evidence, we conclude that Janousek has violated DR 1-102(A)(1) and (3) through (6), as well as the attorney's oath required by § 7-104.
The basic issues in a disciplinary proceeding against a lawyer are whether discipline should be imposed and, if so, the *471 type of discipline appropriate under the circumstances. James, supra. To determine whether and to what extent discipline should be imposed in a lawyer discipline proceeding, the Nebraska Supreme Court considers the following factors: (1) the nature of the offense, (2) the need for deterring others, (3) the maintenance of the reputation of the bar as a whole, (4) the protection of the public, (5) the attitude of the offender generally, and (6) the offender's present or future fitness to continue in the practice of law. Id. Each attorney discipline case must be evaluated individually in light of its particular facts and circumstances. In addition, the propriety of a sanction must be considered with reference to the sanctions imposed in prior similar cases. State ex rel. NSBA v. Flores, 261 Neb. 256, 622 N.W.2d 632 (2001).
Janousek and the Counsel for Discipline have each cited Nebraska cases, arising from disciplinary actions, presenting circumstances they argue are at least similar to those of the instant case for purposes of determining the sanction to be imposed. Both parties refer us to State ex rel. Counsel for Dis. v. Lopez Wilson, 262 Neb. 653, 634 N.W.2d 467 (2001). In Lopez Wilson, the respondent became angry after he learned that the complainant, the respondent's client and close friend, had begun an intimate relationship with the respondent's ex-wife. We imposed a 2-year suspension from the practice of law as a sanction for the respondent's conduct, which conduct included going to the complainant's apartment late at night and threatening to reveal confidential information about the complainant to the court that had issued the complainant's divorce decree and to the then Immigration and Naturalization Service.
The Counsel for Discipline also cites State ex rel. Counsel for Dis. v. Sipple, 265 Neb. 890, 660 N.W.2d 502 (2003), cert. denied ___ U.S. ___, 124 S.Ct. 486, ___ L.Ed.2d ___. In that case, the respondent threatened and intimidated his client in a workers' compensation case, attempting to pressure the client into accepting a settlement offer. When that failed and his client obtained new counsel, the respondent contacted opposing counsel and the Workers' Compensation Court in an attempt to sabotage his former client's case. We imposed a 2-year suspension from the practice of law.
Janousek, on the other hand, cites State ex rel. NSBA v. Schleich, 254 Neb. 872, 580 N.W.2d 108 (1998). In that case, we imposed a 6-month suspension from the practice of law upon the respondent, who had illegally placed a listening device on his home telephone and used the device to record his wife's telephone conversations over a period of 7 to 10 days.
While some aspects of these cases are superficially similar to the circumstances of this case, we do not find any of them to be particularly helpful to our determination here. Cases from other jurisdictions have arisen from somewhat more comparable circumstances, but are still distinguishable. See, e.g., Disciplinary Counsel v. Keith, 92 Ohio St.3d 404, 750 N.E.2d 1106 (2001) (respondent disbarred for 2 years of stalking, harassing, physically assaulting, and vandalizing property belonging to former girl friend); Bd. of Prof. Ethics & Conduct v. Apland, 599 N.W.2d 453 (Iowa 1999) (respondent suspended from practice of law for 2 years for threatening and harassing former wife and her boyfriend); In re Van Buskirk, 981 P.2d 607 (Colo. 1999) (3-year suspension from practice of law imposed on respondent for two domestic disturbances at former fiance's apartment); People v. Groland, 908 P.2d 75 (Colo.1995) (1-year suspension from practice of law imposed for respondent's repeated *472 violation of former wife's restraining orders); In re Frick, 694 S.W.2d 473 (Mo.1985) (respondent disbarred for conduct directed at former girl friend, including anonymous threatening letters, violence, vandalism, and use of firearm to avoid capture by security guards who interrupted act of vandalism). To the extent that our review of case law supports any conclusion, it is this: The fact that no attorney appears to have previously engaged in behavior like Janousek's is indicative of just how egregious his behavior was.
Several aspects of this case reflect adversely on Janousek's fitness to practice law. Obviously, as the referee concluded, the heart of the charges against Janousek is his authorship of the letters. Janousek engaged in a deliberate campaign to discredit the complainant, deprive her of legal counsel, interrupt her education, and terrorize her. Janousek's appalling "White Aryan Resistance" letter was composed entirely of degrading, vile racism and obscenity. Moreover, Janousek's interference with the complainant's attorney-client relationship demonstrates complete disregard for the most fundamental tenet of professional responsibilitythat "every person in our society should have ready access to the independent professional services of a lawyer of integrity and competence." See Canon 1, EC 1-1, of the Code of Professional Responsibility.
We also note that Janousek's threats and harassment were not limited to the letters. The complainant's testimony included several other allegations, which were uncontested by Janousek. Janousek used racial slurs against the complainant when she asked for repayment of a debt Janousek later conceded he owed. Janousek threatened to abuse the legal process to harass the complainant and filed a counterclaim against the complainant which she testified was groundless and which was later dismissed. Janousek threatened the complainant's life. It is beyond dispute that hostile, threatening, and disruptive conduct reflects on an attorney's honesty, trustworthiness, diligence, and reliability and adversely reflects on one's fitness to practice law. See State ex rel. Counsel for Dis. v. Lopez Wilson, 262 Neb. 653, 634 N.W.2d 467 (2001). Despite Janousek's attempt to portray his behavior as a cohesive, isolated incident, the record shows a series of distinct incidents intended to persecute the complainant. Cumulative acts of attorney misconduct are distinguishable from isolated incidents and are therefore deserving of more serious sanctions. State ex rel. Counsel for Dis. v. Cannon, 266 Neb. 507, 666 N.W.2d 734 (2003).
Also relevant is the fact that Janousek's conduct was arguably criminal, even though he was convicted only of violating a protection order. An attorney may be subjected to disciplinary action for conduct outside the practice of law or the representation of clients, and for which no criminal prosecution has been instituted or conviction had, even though such conduct might be found to have been illegal. State ex rel. Nebraska State Bar Assn. v. Bremers, 200 Neb. 481, 264 N.W.2d 194 (1978).
We also take note of Janousek's three prior private reprimands, even though those cases did not involve facts similar to those of the instant case. We impose disciplinary sanctions to deter others from misconduct in order to protect the public and to maintain the reputation of the bar as a whole. See State ex rel. Special Counsel for Dis. v. Shapiro, 266 Neb. 328, 665 N.W.2d 615 (2003). The purpose of a disciplinary proceeding against an attorney is not so much to punish the attorney as it is to determine *473 whether in the public interest an attorney should be permitted to practice. State ex rel. Counsel for Dis. v. Thompson, 264 Neb. 831, 652 N.W.2d 593 (2002). Janousek's prior violations of our disciplinary rules, while distinguishable on their facts, are nonetheless relevant to the primary question before us in this casewhether Janousek is currently fit to practice law in Nebraska. Janousek's serial disregard for our disciplinary rules indicates that he is not.
We conclude, based on our de novo review of the record, that Janousek's conduct is intolerable. Janousek's behavior is not only disgraceful, but shows disrespect for the law, the legal profession, the legal process, the authority of the courts, and basic principles of justice, fairness, and human dignity. Although the determination of an appropriate penalty to be imposed on an attorney requires consideration of any mitigating factors, there is no record in this case of any persuasive mitigating factors. See State ex rel. Counsel for Dis. v. Lechner, 266 Neb. 948, 670 N.W.2d 457 (2003). Upon due consideration, we find that Janousek should be disbarred from the practice of law in the State of Nebraska.

CONCLUSION
The Counsel for Discipline's exception is sustained. It is the judgment of this court that Janousek should be disbarred from the practice of law in the State of Nebraska, and we therefore order Janousek disbarred, effective immediately. Janousek is directed to comply with Neb. Ct. R. of Discipline 16 (rev. 2001), and upon failure to do so, he shall be subject to punishment for contempt of this court. Janousek is directed to pay costs and expenses in accordance with Neb. Rev. Stat. §§ 7-114 and 7-115 (Reissue 1997) and Neb. Ct. R. of Discipline 23(B) (rev. 2001).
JUDGMENT OF DISBARMENT.