DISCIPLINARY COUNSEL v. AULT.

[Cite as *Disciplinary Counsel v. Ault,* 110 Ohio St.3d 207, 2006-Ohio-4247.]

(No. 2006–0441—Submitted April 25, 2006—Decided August 30, 2006.)

———————

**Per Curiam.**

{¶ 1} Respondent, Jerry Edwin Ault of Mansfield, Ohio, Attorney Registration No. 0008445, was admitted to the practice of law in Ohio in 1978. Since June 1, 2000, respondent has served as a judge of the Mansfield Municipal Court. Respondent was elected to a second term in November 2005 and is currently the presiding judge.

{¶ 2} On December 6, 2004, relator, Disciplinary Counsel, charged respondent with four counts of professional misconduct stemming from respondent's abuse of prescription painkilling drugs. The parties stipulated that respondent had violat-

ed provisions of the Code of Judicial Conduct and the Code of Professional Responsibility relative to Counts I through III, and to the dismissal of Count IV. A panel of the Board of Commissioners on Grievances and Discipline heard the cause and, accepting the stipulations, made findings of misconduct and a recommendation, which the board adopted.

## Misconduct

{¶ 3} For each of Counts I, II, and III, the board found separate violations of DR 1–102(A)(4) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation). The board also found as to each count that respondent had failed to uphold the integrity of the judiciary, a violation of Canon 1, and had failed to comply with the law and act in a manner that promotes public confidence in the integrity of the judiciary, a violation of Canon 2. The board further found that respondent had violated Canon 4 relative to all three counts by failing to avoid impropriety and the appearance of impropriety in all his activities.

{¶ 4} Respondent began using painkillers in November 1999, after psychiatrist Dr. David Massie referred him to Dr. Ho Young Chung for help in managing pain caused by respondent's osteoarthritis and other debilitating conditions. In the years that followed, respondent would eventually deceive these two and several other doctors into overprescribing Schedule II, III, and IV narcotics for his use. The parties stipulated to the addictive qualities of these drugs:

{¶ 5} "Prescription drugs are classified into numerical categories according to standards prescribed by the Controlled Substances Act of 1970. The classification is based upon the risk of abuse and the need for strict regulation. Schedule II drugs—such as Oxycontin, Methadone, Percodan and Duragesic patches—are classified as having a high potential for abuse and no automatic prescription refill renewals are permitted. Schedule III drugs—such as Tylenol with Codeine and Vicodin—are classified as having some potential for abuse. Schedule IV drugs— such as Darvon and Darvocet are classified as having a low potential for abuse and are subject to less regulation."

{¶ 6} Acknowledging the risks of taking controlled substances and on Dr. Chung's request, respondent signed a contract setting rules for his use of these drugs. On November 29, 1999, respondent pledged that he would (1) consult only Dr. Chung for his prescriptions, (2) not ask for or accept controlled-substance medications from anyone other than Dr. Chung, (3) use the drugs only as Dr. Chung prescribed and, if he exceeded the prescribed dosage, not attempt to replace the medication, and (4) curtail his alcohol use. Respondent renewed these pledges on January 7, 2002, and December 23, 2002.

{¶ 7} Respondent stipulated to having breached these promises repeatedly during September 2001 through December 2002 by obtaining Schedule II, III,

and IV narcotics from six doctors, mainly Drs. Chung, Massie, Young Kang, and Keun Choi. Drs. Kang and Choi worked at the Get Well Center in Mansfield with Dr. Chung. Dr. Massie, in addition to treating respondent for anxiety, at times also treated his physical ailments.

{¶ 8} During the relevant period, respondent obtained from these doctors 1,432 pills and 20 patches containing ten different narcotic painkillers. He managed to acquire some of this supply by getting Drs. Chung, Massie, Kang, and Choi to prescribe medication for him and by not disclosing to them that they were replicating each other's efforts. Respondent's duplicity resulted in his being prescribed medication far in excess of what any one of these physicians would have authorized.

{¶ 9} In October 2002, the Ohio Pharmacy Board began to investigate respondent's use of narcotic pain medication. Early the next year, the board submitted its investigation to the Richland County Prosecutor's Office, and a special prosecutor was appointed to pursue charges against respondent.

{¶ 10} On April 9, 2003, representatives of the Ohio Lawyers Assistance Program ("OLAP") confronted respondent about his drug use. Respondent was admitted on May 8, 2003, to Talbot Hall at the Ohio State University for inpatient treatment for alcohol abuse and drug addiction. He was released on May 17, 2003, with a diagnosis of addiction to opioids and alcohol. On June 4, 2003, respondent entered into a recovery and monitoring contract with OLAP.

{¶ 11} On December 19, 2003, respondent pleaded no contest to two counts of attempting to obtain a dangerous drug by deception, misdemeanors of the first degree, in violation of R.C. 2923.02 and 2925.22(A). R.C. 2925.22(A) states, "No person, by deception, as defined in section 2913.01 of the Revised Code, shall procure the administration of, a prescription for, or the dispensing of, a dangerous drug." R.C. 2913.01(A) defines "deception" as "knowingly deceiving another or causing another to be deceived by any false or misleading misrepresentation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact." For these offenses, respondent received a suspended 120–day jail sentence, was fined $1,000, and was ordered to serve a two-year probation period under strict conditions to assist in his recovery.

{¶ 12} Evidence in support of Count I of relator's complaint established that between September 25, 2001, and January 28, 2002, respondent deceived Drs. Chung and Massie into prescribing Darvon, Darvocet, and Tylenol with Codeine for him as many as ten times. Sometimes, respondent told Dr. Massie that Dr. Chung was not available to provide a prescription for his pain, concealing from Dr. Massie that he had already obtained a painkilling prescription from another

doctor. At other times, respondent had Dr. Chung write a prescription for painkillers notwithstanding that Dr. Massie had already given him a prescription just a few days earlier.

{¶ 13} Evidence in support of Count II of relator's complaint established that Dr. Choi treated respondent for the first time on May 13, 2002, and prescribed Percodan and Duragesic patches for him. Respondent did not inform Dr. Choi that respondent had seen Dr. Massie the day before and obtained a prescription for 20 Darvocets.

{¶ 14} Evidence in support of Count III established that Dr. Kang treated respondent for the first time on December 5, 2002, and prescribed Vicodin, Percodan, and methadone for his pain. During this office visit, respondent advised that he had previously obtained Percocet from Dr. Massie and had run out of this drug. Dr. Kang admonished respondent that he had violated the terms of his treatment by accepting painkillers from Dr. Massie without Dr. Chung's knowledge. Despite this remonstrance, respondent accepted the prescription from Dr. Kang and did not disclose that Dr. Massie had prescribed 30 Darvocets for pain just a few days before.

### Recommended Sanction

{¶ 15} In recommending a sanction for this misconduct, the board weighed the mitigating and aggravating factors listed in Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg.").

{¶ 16} As mitigating, the parties stipulated that respondent had no prior disciplinary record and that he had cooperated during the disciplinary process. BCGD Proc.Reg. 10(B)(2)(a) and (d). The board further found that respondent deeply regretted his misdeeds.

{¶ 17} Also mitigating is the fact that respondent's problems resulted from a diagnosed chemical dependency that he has made progress in managing. He has successfully completed his two-year OLAP contract and has shown a sustained commitment to recovery, including continued membership in Alcoholics Anonymous. BCGD Proc.Reg. 10(B)(2)(g). Because of these efforts, respondent was discharged early from his court-ordered probation in June 2005.

{¶ 18} The parties stipulated that the appropriate sanction for respondent's misconduct was a 12–month suspension, with the entire suspension stayed on the condition that the respondent successfully complete a new OLAP contract for a probationary period of two years after the final order in this case. The panel and board accepted this proposal, recommending a one-year suspension of respondent's license to practice, all stayed on the conditions advocated by the parties.

Review

{¶ 19} We adopt the findings that respondent violated DR 1–102(A)(4) and Canons 1, 2 and 4, as found by the board. A two-year suspension, all stayed on conditions, however, is the appropriate sanction.

{¶ 20} Respondent suffers chronic pain from a variety of serious physical infirmities. His doctors' attempts to manage this pain with controlled substances and without causing any addiction was no doubt made more difficult by respondent's anxiety disorder and propensity to abuse alcohol. For over a year, respondent complicated this process even further by intentionally deceiving his doctors into feeding the addiction.

{¶ 21} Respondent's addiction, however, apparently did not compromise his performance as a judge. The Clerk of the Mansfield Municipal Court recounted that respondent had "fulfilled all of the obligations of a dedicated public servant" and had shown "impressive leadership in conducting the business of the court." The Mansfield Chief of Police also reported that he had worked with respondent in court and outside of court at all hours of the day, yet respondent had been always been "alert, attentive, and professional." In fact, the police chief never suspected respondent's drug addiction.

{¶ 22} Attorneys are obligated to secure the medical or other therapeutic assistance they need before any client, or in the case of a judge, a litigant, suffers from the attorney's professional incompetence. *Disciplinary Counsel v. Golden,* 97 Ohio St.3d 230, 2002-Ohio-5934, 778 N.E.2d 564, ¶ 24. Thus, in *Disciplinary Counsel v. Connor,* 105 Ohio St.3d 100, 2004-Ohio-6902, 822 N.E.2d 1235, we attributed significant mitigating effect to the fact that although a judge's alcoholism had resulted in two drunk-driving convictions, his alcohol abuse had not impaired his performance on the bench. Because that judge had also committed to treatment and had maintained sobriety for nearly two years, we found that he could continue to act as a judge without any risk to the public or the judicial system. We draw the same conclusion here.

{¶ 23} In determining the appropriate sanction for professional misconduct, we consider " 'the duties violated, the actual injury caused, the lawyer's mental state, the existence of aggravating or mitigating circumstances, and sanctions imposed in similar cases.' " *Disciplinary Counsel v. Connors,* 97 Ohio St.3d 479, 2002-Ohio-6722, 780 N.E.2d 567, ¶ 16, quoting *Stark Cty. Bar Assn. v. Buttacavoli,* 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16. All that is left to do in this case is to review the sanctions imposed in similar cases.

{¶ 24} In *Disciplinary Counsel v. Casalinuovo* (1993), 66 Ohio St.3d 367, 613 N.E.2d 177, a lawyer, after being charged with drug abuse, successfully completed a program of treatment in lieu of conviction. We imposed a two-year suspension for this misconduct, staying the entire suspension on conditions

similar to those required by respondent's OLAP recovery contract. Also comparable is *Disciplinary Counsel v. May,* 106 Ohio St.3d 385, 2005-Ohio-5320, 835 N.E.2d 372, in which we ordered another two-year, conditionally stayed suspension for a lawyer who had forged Vicodin prescriptions but had successfully completed a program of drug treatment in lieu of conviction.

{¶ 25} Respondent is therefore suspended from the practice of law in Ohio for two years. The suspension is stayed, however, on the conditions that respondent (1) serve a two-year probation period pursuant to Gov.Bar R. V(9) and (2) comply with a new two-year OLAP recovery contract during that probation. If respondent fails to comply with the conditions of the stay, the stay shall be lifted, and respondent shall serve the entire two-year suspension.

{¶ 26} Costs are taxed to respondent.

Judgment accordingly.

Moyer, C.J., Resnick, Pfeifer, Lundberg Stratton, O'Connor, O'Donnell and Lanzinger, JJ., concur.

---

Jonathan E. Coughlan, Disciplinary Counsel, and Robert R. Berger, Assistant Disciplinary Counsel, for relator.

Jay Milano, Stacy M. Ganor, and Rachel May Weiser, for respondent.