COLUMBUS BAR ASSOCIATION v. LINNEN.

[Cite as *Columbus Bar Assn. v. Linnen,*
111 Ohio St.3d 507, 2006-Ohio-5480.]

(No. 2006–0443—Submitted July 18, 2006—Decided October 25, 2006.)

**Per Curiam.**

{¶ 1} Respondent, Stephen P. Linnen of Columbus, Ohio, Attorney Registration No. 0071290, was admitted to the practice of law in Ohio in 1999. On April 6, 2005, relator, Columbus Bar Association, charged respondent with violations of the Code of Professional Responsibility. A panel of the Board of Commissioners on Grievances and Discipline heard the cause and made findings of fact, conclusions of law, and a recommendation.

Misconduct

{¶ 2} Respondent admitted the facts alleged in the complaint. At the panel hearing, he also stipulated that his actions violated DR 1–102(A)(3) (prohibiting illegal conduct involving moral turpitude) and 1–102(A)(6) (prohibiting conduct that adversely reflects on a lawyer's fitness to practice law). The panel and

board found that respondent had committed this misconduct based on the following events.

{¶ 3} From February 2002 until November 2003, respondent shocked at least 30 different women throughout Franklin County, Ohio, by appearing before them naked and photographing their reactions. Dubbed "The Naked Photographer" by local media, respondent ran up to his solitary victims wearing nothing but athletic shoes and a knit stocking cap, snapped several pictures of the women while concealing his facial features with the camera, and then ran away. Although he claimed that he usually did not touch his victim, respondent admitted that he would sometimes tap or pinch her "rear end * * * or whatever" to focus the woman's attention on him. He also acknowledged that "maybe" he masturbated in front of the first couple of his victims. After exposing himself, respondent would return to where he had left his clothes, dress, and flee the scene.

{¶ 4} While engaging in these activities, respondent was employed by the Speaker of the Ohio House of Representatives as Legal Counsel for Taxation and Education. He resigned from this position approximately one month after his November 19, 2003 arrest, which was precipitated by his last victim's attempt to catch him herself. At the time of his resignation, respondent had been indicted by the Franklin County Grand Jury on one count of burglary, a felony of the second degree; two counts of gross sexual imposition, a felony of the fourth degree; 13 counts of sexual imposition, a third-degree misdemeanor; and 40 counts of public indecency, a fourth-degree misdemeanor.

{¶ 5} On September 13, 2004, respondent accepted a plea bargain and pleaded guilty to 53 misdemeanor offenses—two first-degree misdemeanor counts of sexual imposition, one first-degree misdemeanor count of aggravated trespass, 11 third-degree misdemeanor counts of sexual imposition, and 39 fourth-degree misdemeanor counts of public indecency. He was sentenced to 18 months of work release, fined $3,000, and ordered to continue counseling. His 18–month sentence was suspended in October 2005 after only 12 months when the work-release facility closed. The Franklin County Common Pleas Court then placed him on probation for five years.

{¶ 6} Since his convictions, including during the year of work release, respondent has been practicing on his own. Between October 2004 and the panel hearing on November 3, 2005, respondent represented seven to nine clients, mainly family, friends, and acquaintances he met through the work-release program. He charges $75 an hour for his services.

## Recommended Sanction

{¶ 7} In recommending a sanction for respondent's misconduct, the panel and board weighed the aggravating and mitigating factors of his case. See Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg.").

{¶ 8} Explaining the impetus for his crimes, respondent testified that each incident was "definitely an adrenalin[e] rush or euphoria * * * very much like a powerful drug" and that he did not consider "what effect it could have on other people." From this, the panel and board found that respondent's motivation was dishonesty and selfishness, an aggravating factor under BCGD Proc.Reg. 10(B)(1)(b). Also in aggravation, the panel and board found that respondent had committed a pattern of misconduct and multiple offenses. BCGD Proc.Reg. 10(B)(1)(c) and (d).

{¶ 9} Adopting the panel's report, the board further concluded that respondent had not genuinely acknowledged the wrongful nature of his conduct or that his actions might have caused his vulnerable victims serious harm, both of which are aggravating factors under BCGD Proc.Reg. 10(B)(1)(g) and (h). One of respondent's victims told the panel that on the evening that he accosted her, she froze and then folded into a fetal position out of fear. As a result of the traumatic encounter, she felt compelled to buy a handgun and learn to use it, and she now keeps the weapon accessible because she continues to fear that respondent may return. The panel and board found especially egregious that respondent said nothing in contrition either about or to this victim even when he took the stand shortly after she testified.

{¶ 10} The panel and board agreed that respondent mainly regretted the adversity that his misconduct had caused in his own life, and not the impact it had on the lives of his victims. The panel noted that respondent "acknowledged his wrongful conduct only in terms of creating a tremendous amount of trouble for himself. At one point, he stated 'I have certainly done some bad things * * * and the consequences are * * * almost immeasurable in the way they've affected my life, the way they've harmed my family.'" The panel also observed that respondent had continued to accost women, obviously knowing it was wrong, rather than seek treatment:

{¶ 11} "The fact that Respondent's misconduct did not end until he was caught by his final victim is not lost on the Panel. Instead of owning up to his misconduct and self-disclosing it, he could easily have continued to victimize unsuspecting women for a long time to come but for the courage of his final victim."

{¶ 12} In mitigation of his misconduct, respondent attempted to establish a medical disability. Pursuant to BCGD Proc.Reg. 10(B)(2)(g)(i) though (iv), respondent offered evidence that he had been medically diagnosed with sexual addiction by his treating psychologist, Dr. George Mass; that this mental disability had contributed to cause his misconduct; that he had been successfully treated for his illness; and that he had been cleared as ethically and competently able to return to the practice of law. The panel and board, however, were not convinced that Dr. Mass's diagnosis, treatment, and prognosis were reliable.

{¶ 13} Testifying before the panel, Dr. Mass said that he had been treating respondent since the time of respondent's arrest and had determined at their first meeting that respondent suffered from sexual addiction, with elements of exhibitionism and depression. Dr. Mass described sex addiction as a special case of obsessive-compulsive disorder that is characterized by a preoccupation with sexual thoughts and the compulsion to act out those thoughts. According to Dr. Mass, the ritual of acting out relieved respondent's depression, which Dr. Mass attributed to the stressors in respondent's life—frustration with his job, a long-distance romantic relationship, and repayment of his debt from law school. Respondent escaped these stressors, Dr. Mass reported, when he performed the ritual of planning his next encounter and took the steps to make the encounter happen.

{¶ 14} Three concerns prevented the panel and board from relying on Dr. Mass's testimony as to respondent's illness and the success of his treatment program. Initially troubling were preliminary psychological testing results that suggested respondent was predisposed to adjust his symptoms in order to procure a prognosis that could work to his advantage, that is, to "look sick." Dr. Mass conceded that most other professionals in his field would not have relied on this test, as he did in part, to document the progress he claimed that respondent had made through treatment. Because the gauge by which his recovery was measured was admittedly unreliable, the panel feared that respondent might have manipulated his diagnosis.

{¶ 15} Second, the panel and board were skeptical of Dr. Mass's decision not to refer respondent to a psychiatrist for drug therapy for respondent's depression. Dr. Mass had declined to require this treatment because his patient chose not to be medicated. Given the manifestations of his claimed condition, respondent's reluctance to agree to this additional form of treatment and Dr. Mass's deference to his decision seemed to the panel and board a less-than-committed approach to combating the illness.

{¶ 16} Finally, the panel and board were troubled that Dr. Mass could cite nothing other than the facts that respondent was a faithful member of Sex Addicts Anonymous ("SAA") and had gained insight into the stressors that

triggered his unusual behavior to quantify and predict the chances of a relapse. Particularly disturbing was Dr. Mass's acknowledgement that stress at the levels lawyers routinely experience would probably lead to regression. In fact, Dr. Mass advised that someone with respondent's diagnosis, if unable to achieve satisfaction from one form of acting out, is likely to seek another outlet, even stalking and rape.

{¶ 17} For these reasons, the panel and board did not accept Dr. Mass's diagnosis or attribute mitigating effect to respondent's purported mental disability for the purpose of BCGD Proc.Reg. 10(B)(2)(g). Similarly, the panel and board did not assign much weight to the testimony of Paul Caimi, the associate director of the Ohio Lawyers Assistance Program ("OLAP"). Caimi had monitored respondent's recovery efforts, including his two years of compliance with a five-year OLAP mental-health contract and SAA participation, and commended his progress. Caimi's relevant and considerable expertise, however, lay in treating alcohol and drug dependency and thus did little to confirm the claimed mental illness of sexual addiction.

{¶ 18} Respondent also offered in mitigation the testimony of his ex-wife, who stated that he had become a better person in the aftermath of his arrest, and letters from a lifelong friend, a former co-worker, and three clients recommending his good character apart from his crimes. BCGD Proc.Reg. 10(B)(2)(e). Respondent's lack of a prior disciplinary record constituted a mitigating factor under BCGD Proc.Reg. 10(B)(2)(a). The panel and board further found mitigating that respondent had cooperated completely in the disciplinary process. BCGD Proc.Reg. 10(B)(2)(d).

{¶ 19} Relator argued that an indefinite suspension of respondent's license to practice was appropriate and asked that reinstatement be conditioned, in part, on a mental-health examination by an independent qualified mental health-care professional. Respondent advocated a definite term of suspension, to be partially stayed on conditions. The panel recommended an indefinite suspension with any reinstatement to be conditioned on an independent health-care professional's evaluation of respondent's mental health and the propriety of reinstatement. The board accepted this sanction, recommending an indefinite suspension with the proposed condition for reinstatement.

{¶ 20} Respondent objects to the board's recommendation, arguing that Dr. Mass's opinion is entitled to great weight, that respondent did genuinely acknowledge the gravity of his misdeeds, and that an indefinite suspension is too harsh given the presence of these mitigating factors.

## Review

{¶ 21} On review, we find that respondent violated DR 1–102(A)(3) and (6). We further find that the panel and board justifiably suspected the validity of Dr.

Mass's diagnosis, legitimately discounted respondent's expressions of contrition, and properly recommended respondent's indefinite suspension from the practice of law, with conditions for reinstatement. We thus overrule respondent's objections and adopt the recommended sanction.

### Claimed Mental Disability and Contrition

{¶ 22} We decline to find a mitigating mental disability based on the combined sex addiction, exhibitionism, and depression that Dr. Mass diagnosed, for the reasons cited by the panel and board. But to clarify, our decision does not come so much from any deficiencies in Dr. Mass's conclusions as it does from an underlying skepticism of respondent's sincerity in claiming mental disability. The psychological profile suggesting that respondent might feign illness, the fact that he chose not to avail himself of recommended medication therapy for his condition, and the typical and hardly overwhelming stressors cited as compelling his behavior simply do not paint the usual picture of a genuinely confessed addict, genuinely committed to recovery. To the contrary, we suspect that respondent sought Dr. Mass's diagnosis specifically to raise it as a mitigating factor in defense to inevitable disciplinary and criminal charges and not solely to stop himself from pulling what he thought others might consider an "amusing prank."

{¶ 23} Similarly, we share the panel's and the board's dim assessment of respondent's professed remorse. Although he repeatedly articulated his regret, his concern was most often and genuinely shown when he spoke of the embarrassment and hardship that had befallen him and his family. In addition to the examples already cited, respondent explained how hard it had been for him to call OLAP after his arrest, as he was "completely devastated," "had lost everything that [he] had worked for," and had "lost [his] reputation."

{¶ 24} In fact, respondent mentioned his victims' trauma hardly at all. Moreover, his indifference is unmistakable—he failed to even acknowledge the life-altering effect his actions had on the victim who testified before the panel. This conceit and callousness belie any pretense of regret for his victims' suffering, and the panel and board properly so found.

### The Appropriate Sanction

{¶ 25} In determining the appropriate sanction for professional misconduct, we consider the duties violated, the actual or potential injury caused, the lawyer's mental state, the existence of aggravating or mitigating circumstances, and the sanctions imposed in similar cases. *Disciplinary Counsel v. Connors,* 97 Ohio St.3d 479, 2002-Ohio-6722, 780 N.E.2d 567, ¶ 16, quoting *Stark Cty. Bar Assn. v. Buttacavoli,* 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16. All that is left to do in this case is to review the sanctions imposed in similar cases. *Disciplinary Counsel v. Ault,* 110 Ohio St.3d 207, 2006-Ohio-4247, 852 N.E.2d 727.

{¶ 26} In *State ex rel. Nebraska Supreme Court Counsel for Discipline v. Janousek* (2004), 267 Neb. 328, 674 N.W.2d 464, the Nebraska Supreme Court disbarred a lawyer for outrageous acts of illegality and moral turpitude that adversely reflected on his fitness to practice law. That lawyer had harassed and terrorized a former girlfriend by stalking her, sending horribly racist and obscene letters to her, and also sending letters designed to jeopardize her professional relations with her legal counsel and her graduate school. There, as here, the parties cited state precedent that each argued was similar in some respect to the situation at bar, but nothing came close to that lawyer's behavior. The court observed:

{¶ 27} "To the extent that our review of case law supports any conclusion, it is this: The fact that no attorney appears to have previously engaged in behavior like Janousek's is indicative of just how egregious his behavior was." Id. at 336, 674 N.W.2d 464.

{¶ 28} While respondent's actions are unprecedented, the overlapping offenses of committing illegal conduct involving moral turpitude and conduct that reflects adversely on a lawyer's fitness to practice law usually demand an actual suspension from the practice of law in order to protect the public's interest and the integrity of the legal profession. Depending on the gravity of the misconduct and any extenuating circumstances, sanctions typically range from a definite period of suspension to disbarment. See, e.g., *Disciplinary Counsel v. Goodall,* 103 Ohio St.3d 501, 2004-Ohio-5583, 817 N.E.2d 23 (lawyer guilty of fourth-degree felony committed during domestic dispute was suspended for six months with credit for time served under interim felony suspension); *Cincinnati Bar Assn. v. Hennekes,* 110 Ohio St.3d 108, 2006-Ohio-3669, 850 N.E.2d 1201 (lawyer suspended for two years after he was convicted of felony offense of conspiring to distribute and possess with intent to distribute cocaine); and *Disciplinary Counsel v. White,* 109 Ohio St.3d 402, 2006-Ohio-2709, 848 N.E.2d 504 (lawyer disbarred, while already on indefinite suspension, for DR 1–102(A)(3) and (6) misconduct involving felony drug use and violation of court order prohibiting drug use).

{¶ 29} Disbarment is required, however, when such conduct involves predatory sexual acts and dishonesty beyond any possible redemption. *Disciplinary Counsel v. Ostheimer* (1995), 72 Ohio St.3d 304, 649 N.E.2d 1217 (during a three-year period, lawyer fabricated court documents to substantiate that his adopted daughter had been placed on a contrived drug-use probation program, the violation of which would ostensibly require her imprisonment, so that he could feign authority to conduct strip searches and gain the girl's submission to sexual activity, eventually including digital and penile penetration).

{¶ 30} Relator does not argue that respondent's ethical sensitivity is so fatally defective as to require disbarment. Moreover, of all the cases cited by the parties, *Disciplinary Counsel v. Pansiera* (1997), 77 Ohio St.3d 436, 674 N.E.2d

1373, is the most comparable, and we did not disbar the attorney in that case despite reprehensible sex-related misconduct. There, a lawyer exploited his relationship with a teenager, whom he had befriended through Alcoholics Anonymous, and was later convicted on several counts of corrupting a minor. We indefinitely suspended the lawyer, admonishing that which is truly axiomatic:

{¶ 31} "[A] lawyer 'should refrain from all illegal and morally reprehensible conduct. Because of his position in society, even minor violations of law by a lawyer may tend to lessen public confidence in the legal profession.' EC 1–5." *Pansiera,* 77 Ohio St.3d at 437–438, 674 N.E.2d 1373, citing *Disciplinary Counsel v. McCrae* (1996), 75 Ohio St.3d 511, 664 N.E.2d 523.

{¶ 32} Indefinite suspension is also appropriate here, despite respondent's egregious misconduct. As the panel and board concluded, the evidence presented failed to reliably establish that (1) respondent's misconduct stemmed from a real, definable medical disability and not from a pretense of a medical disability masking serious antisocial conduct or (2) providing that the mental disability exists, respondent is in compliance with a treatment plan that will successfully deter further acting out. But on the other hand, we also have no evidence from which to conclude that respondent can never remedy these deficiencies or even that some other manageable mental illness underlies his bizarre behavior. Thus, because the possibility of this proof exists and respondent may in the future be able to sufficiently demonstrate that he is able to return to the competent, ethical, and professional practice of law, we do not disbar him. Accord *Ohio State Bar Assn. v. Johnson,* 96 Ohio St.3d 192, 2002-Ohio-3998, 772 N.E.2d 1184 (state senator convicted of extorting constituents was indefinitely suspended from the practice of law, rather than disbarred, because the possibility of rehabilitation existed); *State ex rel. Nebraska Supreme Court Counsel for Discipline v. Hogan* (2006), 272 Neb. 19, 717 N.W.2d 470 (Nebraska Supreme Court indefinitely suspended a lawyer from the practice of law despite unsubstantiated claims of sexual addiction that he claimed had mitigated misconduct involving sexual improprieties taken with a girlfriend's young daughter).

{¶ 33} Respondent is therefore indefinitely suspended from the practice of law in Ohio. Pursuant to Gov.Bar R. V(10)(B), respondent may not petition for reinstatement before two years from the date of our order. In addition to the other requirements of that rule, respondent's reinstatement shall be conditioned on submission of an independent and qualified health-care professional's evaluation of his mental health and the propriety of his reinstatement. Costs are taxed to respondent.

Judgment accordingly.

Moyer, C.J., Resnick, Pfeifer, Lundberg Stratton, O'Connor, O'Donnell and Lanzinger, JJ., concur.

Bradley N. Frick & Associates and Bradley N. Frick;  Susan C. Walker, Assistant Attorney General;  and Bruce A. Campbell, Bar Counsel, and A. Alysha Clous, Assistant Bar Counsel, for relator.

Kegler, Brown, Hill & Ritter, Geoffrey Stern, and Rasheeda Z. Khan, for respondent.