**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Disciplinary Counsel v. Amaddio and Wargo,* **Slip Opinion No. 2020-Ohio-141.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2020-OHIO-141

DISCIPLINARY COUNSEL *v*. AMADDIO AND WARGO.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Disciplinary Counsel v. Amaddio and Wargo,* **Slip Opinion No. 2020-Ohio-141.]**

*Attorneys—Misconduct—Violations of the Rules of Professional Conduct—One-year suspension.*

(No. 2019-0809—Submitted August 6, 2019—Decided January 22, 2020.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2018-068.

_____

**Per Curiam.**

**{¶ 1}** Respondent Mark Douglas Amaddio, of Beachwood, Ohio, Attorney Registration No. 0041276, was admitted to the practice of law in Ohio in 1989. Respondent John Joseph Wargo Jr., of Berea, Ohio, Attorney Registration No. 0023299, was admitted to the practice of law in Ohio in 1975. Although Amaddio and Wargo are not members of the same firm, they sometimes work together on medical-malpractice and personal-injury cases.

**{¶ 2}** In complaints filed with the Board of Professional Conduct on November 29, 2018, relator, disciplinary counsel, alleged that Amaddio and Wargo attempted to collect a clearly excessive fee in a wrongful-death case in the absence of a signed contingent-fee agreement. The complaints also alleged that they engaged in conduct that adversely reflected on their fitness to practice law by circulating a frivolous draft petition to remove their client, the decedent's father, as the administrator of the estate in an effort to pressure the client to pay the excessive fee.

**{¶ 3}** The parties entered into stipulations of fact, misconduct, and mitigating factors and recommended that Amaddio and Wargo be publicly reprimanded for their misconduct. Based on those stipulations, the parties' joint exhibits, and the testimony adduced at a hearing before a panel of the board, the board found that Amaddio and Wargo engaged in the charged misconduct but recommends that they be suspended from the practice of law for six months, fully stayed on the condition that they engage in no further misconduct.

**{¶ 4}** We accept the board's findings of fact and misconduct, but for the reasons stated below, we find that the appropriate sanction for Amaddio's and Wargo's misconduct is a one-year suspension from the practice of law in Ohio.

**Misconduct**

**{¶ 5}** In April 2016, 16-year-old O.B. was in the care of a hospital that was treating her for mental-health disorders. On April 13, she died as the result of an apparent suicide. A staff member and administrator of the hospital immediately acknowledged responsibility for O.B.'s death and expressed condolences to her parents.

**{¶ 6}** O.B.'s parents ("the father" and "the mother")[1] decided to personally handle negotiations with the hospital, in an effort to strip away organizational

---

1. Because the terms of the settlement agreement between the hospital and the decedent's family are confidential, we do not use the names of the decedent and her parents.

2

bureaucracy and engage in a "compassionate collaboration" with the doctors and hospital administrators. O.B.'s parents set three goals: (1) to ensure that the surviving members of their family, including O.B.'s two younger sisters, received the treatment necessary to deal with their loss, (2) to establish school-based mental-health initiatives, including a partnership between the hospital and local city schools to provide holistic transitional care for students who return to school after receiving mental-health treatment, and (3) to reach a financial settlement with the hospital that honored and respected O.B.'s life.

{¶ 7} Although O.B.'s parents planned to negotiate with the hospital themselves, they also sought to identify an attorney who would represent their interests if the negotiations ever broke down. To that end, the father interviewed multiple attorneys in the weeks following O.B.'s death.

{¶ 8} The father first spoke with Amaddio by telephone and was impressed with his empathy. O.B.'s parents later met with Amaddio at their home. At that meeting, Amaddio proposed a reduced contingent fee of 20 percent—because it was apparent that the family wanted to avoid litigation—but no fee agreement was signed. The father made it clear to Amaddio (and all the other attorneys he interviewed) that he did not want to hire an attorney unless and until negotiations with the hospital broke down.

{¶ 9} In the ensuing months, the father met multiple times with the hospital's president, administrators, medical staff, and in-house counsel and established a compassionate collaboration that achieved all of the family's goals. The mother frequently accompanied the father to those meetings—but Amaddio never did. The father kept Amaddio apprised of the progress of the negotiations to ensure a seamless transition in the event that the negotiations broke down.

{¶ 10} As the father entered into the final stages of the negotiations, Amaddio explained that it would be necessary to open an estate and obtain the probate court's approval for any monetary settlement. In early November 2016,

Wargo prepared and filed the documents necessary to open O.B.'s estate and have the father appointed as the administrator.

{¶ 11} Later that month, O.B.'s parents reached a confidential settlement with the hospital that accomplished all their goals—including a seven-figure financial settlement. The father maintained that they would not have been able to achieve that result if attorneys had been involved. The father advised the hospital's counsel that Amaddio and Wargo would obtain the court's approval of the settlement. All told, Amaddio spent approximately 15 hours on the matter in the seven months between O.B.'s death and the signing of the settlement agreement between her parents and the hospital.

{¶ 12} In a series of texts after the settlement, Amaddio mentioned to the father that he could not speak with the hospital's counsel until he had a signed engagement contract and that O.B. would have been proud of the father's hard work. The father responded:

> Thank you. I took care of my daughter which I needed to do!
>
> Thanks for your honesty, compassion, empathy and support. I could not have moved with confidence without your words. You are a good man!!!!!!!
>
> I am open tomorrow to talk and sign contract with you.

{¶ 13} When the father and Amaddio met the following day, the father expected to sign a contract for Amaddio to handle the probate matter for a fee of a few thousand dollars. Instead, Amaddio presented him with the same 20 percent contingent-fee agreement he had presented at their first meeting, and the father refused to sign it. Amaddio advised the father to contact Wargo about the probate proceedings and shook his hand.

{¶ 14} The father first met with Wargo in early December 2016, with the expectation that they would discuss the pending probate matter. However, a major focus of the conversation was Amaddio's fee. Wargo suggested that Amaddio would agree to significantly reduce the fee and that the hospital might agree to pay a portion of it. With the father's consent, Wargo called the hospital's attorney to discuss that possibility and left a message requesting a return call. But the father withdrew his consent to those discussions later that day and formally terminated Wargo's representation on December 19, 2016.

{¶ 15} Thereafter, the father obtained new counsel, who informed Wargo that the family did not believe that they owed him and Amaddio any fee relating to the negotiation and settlement with the hospital. Wargo and Amaddio then enlisted the aid of Wargo's partner, Tom Wilson, to pursue a claim for attorney fees. Wilson proposed filing an application to remove the father as the administrator of O.B.'s estate to pressure her parents into paying a fee. Wargo did not question the proposed tactic and thought, "Okay, you know, play some hardball."

{¶ 16} Wilson caused a draft petition for the father's removal as administrator to be hand-delivered to the father—and later e-mailed it to the father's new attorney and the hospital's in-house counsel with a cover e-mail stating that it would be filed on January 17, 2017, "absent a successful resolution of the attorney fee issue." As drafted, the petition included a brief summary of O.B.'s mental-health conditions, the events that led to her hospitalization, and the circumstances of her death. It also accused the father of fraudulently representing that he would pay a 20 percent contingent fee to induce Amaddio to help him negotiate the settlement, and it disclosed the amount and structured payout of the confidential settlement between O.B.'s parents and the hospital. The draft petition concluded by identifying Amaddio and Wargo as creditors of the estate and requesting that the father be removed as the administrator.

{¶ 17} Amaddio and Wargo were aware of the content of the draft petition and acknowledged that it was intended to pressure the father to pay them a fee. The board found that the timing of its delivery to O.B.'s parents—just days before their first Christmas without O.B.—was extremely hurtful to the grieving family.

{¶ 18} Soon thereafter, the attorney whom O.B.'s parents had recently hired and outside counsel that had been hired by the hospital separately advised Wilson that Amaddio and Wargo should abandon their fee claim. Amaddio and Wargo did not file the petition to remove the father, but they did file an application for attorney fees in which they alleged that the father had orally agreed to a 20 percent contingent fee. One day before the scheduled hearing on their fee application, Amaddio and Wargo withdrew it.

{¶ 19} All issues between Amaddio, Wargo, and O.B.'s parents were resolved after O.B.'s parents initiated sanction proceedings against Amaddio and Wargo. Amaddio and Wargo agreed to donate $30,000 to the mental-health organization that the family had established in O.B.'s honor and issue "separate, heartfelt and sincere" letters of apology to the father and the mother. Amaddio and Wargo had paid one-half the donation amount before their April 24, 2019 disciplinary hearing and are scheduled to pay the remaining balance by December 31, 2020. Pursuant to the terms of Amaddio and Wargo's settlement with O.B.'s parents, no further restitution is owed.

{¶ 20} The parties stipulated that Amaddio and Wargo's attempt to collect a seven-figure fee for the services they provided to O.B.'s parents violated Prof.Cond.R. 1.5(a) (prohibiting a lawyer from making an agreement for, charging, or collecting an illegal or clearly excessive fee) and that by circulating the draft petition accusing the father of being a fraud and a liar, they engaged in conduct that, although not specifically prohibited by rule, nonetheless adversely reflects on their fitness to practice law, in violation of Prof.Cond.R. 8.4(h) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice

law). *See Disciplinary Counsel v. Bricker*, 137 Ohio St.3d 35, 2013-Ohio-3998, 997 N.E.2d 500, ¶ 21. The board found that Amaddio and Wargo committed the charged misconduct and noted that even if they were entitled to a fee on the basis of quantum meruit, the seven-figure remuneration that they had sought was clearly excessive for Amaddio's 15 hours of communication with the father and Wargo's preparation of the initial probate documents.

## Sanction

{¶ 21} When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

{¶ 22} The board rejected the parties' stipulation that no aggravating factors are present in this case. Instead, it found that Amaddio and Wargo acted with a selfish motive and caused harm to O.B.'s vulnerable family by threatening to publicly accuse the father of fraud. *See* Gov.Bar R. V(13)(B)(2) and (8).

{¶ 23} As mitigating factors, the board found that neither Amaddio nor Wargo had a prior disciplinary record and that they both had made a timely good-faith effort to rectify the consequences of their misconduct, made full and free disclosure to the board and exhibited a cooperative attitude toward the disciplinary proceedings, and submitted evidence of their good character and reputation. *See* Gov.Bar R. V(13)(C)(1), (3), (4), and (5).

{¶ 24} The parties stipulated that the appropriate sanction for Amaddio and Wargo's misconduct is a public reprimand. In support of that sanction, the parties relied on cases publicly reprimanding attorneys who charged or collected clearly excessive fees in violation of Prof.Cond.R. 1.5(a) *or* engaged in conduct that adversely reflected on their fitness to practice law in violation of Prof.Cond.R. 8.4(h). *See, e.g., Columbus Bar Assn. v. Adusei*, 136 Ohio St.3d 155, 2013-Ohio-3125, 991 N.E.2d 1142 (publicly reprimanding an attorney who had no written fee

agreement but retained nearly $8,000 as his fee for collecting nearly $24,000 in life-insurance proceeds); *Geauga Cty. Bar Assn. v. Martorana*, 137 Ohio St.3d 19, 2013-Ohio-1686, 997 N.E.2d 486 (publicly reprimanding an attorney who charged five clients excessive and nonrefundable fees ranging from $1,695 to $2,300 for services she did not complete); *see also Disciplinary Counsel v. Rosen*, 144 Ohio St.3d 113, 2015-Ohio-3420, 41 N.E.3d 383 (publicly reprimanding an attorney who improperly accessed information on a restricted government database); *Disciplinary Counsel v. Mecklenborg*, 139 Ohio St.3d 411, 2014-Ohio-1908, 12 N.E.3d 1166 (publicly reprimanding an attorney who failed to disclose on his driver's-license application that he had recently been charged with operating a vehicle while intoxicated). But the board distinguished those cases on the grounds that they did not involve violations of both rules and that the attorneys in the cases involving violations of Prof.Cond.R. 8.4(h) did not cause specific harm to an identified and vulnerable victim as Amaddio and Wargo did.

{¶ 25} The board also considered two cases in which we sanctioned attorneys for threatening to pursue criminal charges to gain advantage in fee disputes with former clients. In *Cincinnati Bar Assn. v. Cohen*, 86 Ohio St.3d 100, 712 N.E.2d 118 (1999), we publicly reprimanded an attorney for threatening to file criminal charges against a former client who had issued him two checks, totaling $250, that were returned for insufficient funds. After the client filed a grievance against him, Cohen wrote to the client acknowledging his improper conduct and asserting that he had never intended to file criminal charges. We found that Cohen's conduct violated former DR 7-105 (prohibiting a lawyer from threatening to pursue criminal charges solely to obtain an advantage in a civil matter). But recognizing that his threats represented an isolated incident of bad judgment for which he had apologized, we publicly reprimanded Cohen for his misconduct.

{¶ 26} And in *Cincinnati Bar Assn. v. Hartke*, 132 Ohio St.3d 116, 2012-Ohio-2443, 969 N.E.2d 1189, the attorney went to a former client's home after she

failed to pay his fee of approximately $5,000 for handling her divorce and engaged in a heated discussion with the client in the presence of her six-year-old daughter. When it became clear that the client would not pay, Hartke threatened to file criminal charges and told her that she could go to jail and lose her children. He then accompanied her to the bank to withdraw the amount that she owed him, but she was so distraught that bank personnel called the police, who suggested that she pay Hartke what she owed. Hartke accepted $3,000 to satisfy the debt. We found that Hartke "threaten[ed] to present criminal charges * * * solely to obtain an advantage in a civil matter" in violation of Prof.Cond.R. 1.2(e) and that his conduct adversely reflected on his fitness to practice law in violation of Prof.Cond.R. 8.4(h). Recognizing that he had previously been suspended from the practice of law, had acted with a selfish motive, had caused emotional harm to a vulnerable client, and had failed to fully acknowledge the wrongful nature of his conduct, we suspended him from the practice of law for six months with no stay.

{¶ 27} The board determined that Amaddio's and Wargo's misconduct warrants a sanction more severe than a public reprimand because they violated both Prof.Cond.R. 1.5(a) and Prof.Cond.R. 8.4(h). But the board also credited them for abandoning their threat to file the petition to remove the father as the administrator of O.B.'s estate, acknowledging their wrongdoing, and apologizing to O.B.'s parents. Citing the absence of prior discipline over their many years of practice, their sincere regret, and their good-faith efforts to rectify the consequences of their misconduct, the board found that they were not likely to repeat their misconduct and concluded that an actual suspension was not necessary to protect the public or promote public confidence in the legal profession. Therefore, the board recommends that we suspend Amaddio and Wargo from the practice of law for six months but stay the entire suspension on the condition that they engage in no further misconduct.

{¶ 28} Having reviewed the record and our precedent, we find that a fully stayed six-month suspension is entirely inadequate to sanction Amaddio and Wargo for the misconduct at issue in this case. Here, in contrast to the cases cited by the parties and the board, Amaddio and Wargo charged and attempted to collect a seven-figure contingent fee—no less than $1,000,000—for approximately 15 hours of consultation about a wrongful-death claim and the preparation of basic probate documents to open the decedent's estate. They also attempted to coerce the father's compliance with their unreasonable demands by threatening to publicly file a document that (1) sought to remove the father from his position as the administrator of his recently deceased 16-year-old daughter's estate, (2) contained personal and confidential information about his daughter, the circumstances of her death, and her parents' confidential settlement with the hospital where her death occurred, (3) accused the father of fraudulently inducing Amaddio and Wargo to help him negotiate the settlement by promising to pay them 20 percent of any settlement obtained, and (4) accused the father of self-dealing for allocating a greater portion of the settlement to himself and the mother, at the expense of their surviving children.

{¶ 29} The fee that Amaddio and Wargo claimed was grossly disproportionate to the amount and difficulty of the work that they had performed. In addition, the alleged fee agreement was unenforceable as a matter of law because it was never reduced to a writing signed by the client and the attorneys as required by R.C. 4705.15(B) (requiring a contingent-fee agreement in connection with a claim that is or may become the basis of a tort action to be reduced to a writing signed by both the client and the lawyer). *See also* Prof.Cond.R. 1.5(c)(1) (requiring a lawyer to set forth a contingent-fee agreement in a writing signed by both the client and the lawyer). Although the board credited Amaddio and Wargo for abandoning their threat to publicly file the inflammatory petition, the pair nevertheless maintained their seven-figure demand in their April 2017 application

for attorney fees.  O.B.'s parents successfully negotiated a seven-figure settlement with the hospital just over seven months after their daughter's tragic death, but they spent the next year of their lives and incurred $42,000 in attorney fees opposing Amaddio and Wargo's unreasonable claim.  On these facts, we conclude that a sanction more severe than those recommended by the parties and the board is warranted.

{¶ 30} Accordingly, Mark Douglas Amaddio and John Joseph Wargo Jr. are  suspended from the practice of law in Ohio for one year.  Costs are taxed to Amaddio and Wargo in equal shares.

Judgment accordingly.

O'CONNOR, C.J., and FRENCH, FISCHER, DONNELLY, and STEWART, JJ., concur.

KENNEDY, J., dissents, with an opinion joined by DEWINE, J.

_____

**KENNEDY, J., dissenting.**

{¶ 31} I dissent from the majority's determination that the misconduct of respondents, Mark Douglas Amaddio and John Joseph Wargo Jr., warrants the imposition of an actual one-year suspension from the practice of law.  In my view, a one-year suspension, fully stayed on the condition of no further misconduct, is consistent with our precedent and is the appropriate sanction in this case.

{¶ 32} The primary purpose of our discipline process is not to punish the offending attorney but to protect the public, *Disciplinary Counsel v. Agopian*, 112 Ohio St.3d 103, 2006-Ohio-6510, 858 N.E.2d 368, ¶ 10, and "[i]n determining the appropriate sanction for professional misconduct, we consider the duties violated, the actual or potential injury caused, the lawyer's mental state, the existence of aggravating or mitigating circumstances, and the sanctions imposed in similar cases," *Columbus Bar Assn. v. Linnen*, 111 Ohio St.3d 507, 2006-Ohio-5480, 857 N.E.2d 539, ¶ 25.

{¶ 33} The majority states that "[h]aving reviewed the record and our precedent, we find that a fully stayed six-month suspension is entirely inadequate to sanction Amaddio and Wargo for the misconduct at issue in this case." Majority opinion at ¶ 28. The majority, however, cites no precedent supporting its assertion that an actual one-year suspension is the appropriate sanction. While no one existing case may share the specific facts of Amaddio's and Wargo's misconduct, we should nonetheless be guided by precedent and reconcile current cases with that precedent to provide meaningful guidance to the lawyers subject to our system of discipline.

{¶ 34} I agree with the Board of Professional Conduct that none of the cases cited by respondents support the imposition of a public reprimand as a sufficient sanction to protect the public under the circumstances of this case. I also agree that our decision in *Cincinnati Bar Assn. v. Hartke*, 132 Ohio St.3d 116, 2012-Ohio-2443, 969 N.E.2d 1189, is instructive and militates in favor of a fully stayed suspension from the practice of law.

{¶ 35} In *Hartke*, the disciplined attorney, James R. Hartke, had represented Jacqueline Usher in her divorce and earned fees totaling $5,000. Hartke and Usher had agreed that the fees would be paid out of a distribution Usher was entitled to from her ex-husband's 401(k) plan. But after she received that distribution, she failed to pay Hartke's fee and refused to answer or return his calls inquiring about it. Hartke went to her home, angrily confronted Usher in front of her six-year-old child, demanded payment of his fee, and threatened criminal action against her if she did not comply. He then insisted that they go to the bank together and withdraw the funds, and at the bank, Usher was so visibly upset that a teller called the police. After the police arrived and suggested that Usher pay Hartke what she owed him, Hartke agreed to accept $3,000 to satisfy the obligation.

{¶ 36} We found that Hartke violated Prof.Cond.R. 1.2(e) (prohibiting a lawyer from threatening criminal charges solely to gain advantage in a civil matter)

and 8.4(h) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law). The aggravating factors were a previous suspension from the practice of law, a selfish motive, emotional harm to a vulnerable client, and Hartke's failure to fully acknowledge the wrongfulness of his conduct. In mitigation, Hartke had made full disclosure to the panel, the misconduct was a one-time incident, and it was contrary to his "general character." *Id*. at ¶ 10.

{¶ 37} We concluded that the aggravating factors outweighed the mitigation, rejected the recommended sanction of a fully stayed six-month suspension, and imposed an actual six-month suspension from the practice of law. *Id*., 132 Ohio St.3d 116, 2012-Ohio-2443, 969 N.E.2d 1189, at ¶ 12, 20.

{¶ 38} *Hartke* is not directly on point. Unlike this case, *Hartke* did not involve a clearly excessive fee. Nonetheless, to the extent it is comparable to respondents' misconduct, Hartke's misconduct was more serious. Although both respondents and Hartke used improper threats to pressure a client to pay their fees, respondents did not threaten criminal charges against a vulnerable client, go to the client's home, or engage in a heated argument with the client in front of a child of tender years. Nor did they force the client to go to a bank and withdraw funds or receive a negotiated payment upon the arrival of law enforcement. Also, unlike Hartke, respondents have fully acknowledged the wrongfulness of their conduct. I do not condone respondents' actions, but I must nevertheless recognize that they lack prior disciplinary records, they made a timely, good-faith effort to rectify their misconduct, and they presented evidence of their good character and reputation. Moreover, they received no fee for the 15 hours of legal services performed and agreed to make a $30,000 donation to a mental-health organization established in the name of their clients' daughter. At the time of the panel hearing, $15,000 had already been donated, and respondents have until the end of 2020 to pay the remainder.

**{¶ 39}** The board adopted the panel's findings of fact and conclusions of law, including the following finding:

> Based upon their demeanor and testimony at the hearing, the panel finds that Respondents are sincere in regretting their actions and they have made good faith efforts to rectify the consequences of their admitted misconduct. *More importantly, the panel does not believe this conduct is likely to be repeated, given Respondents' many years in practice without any disciplinary problems and the evidence of their good character. Accordingly, we do not find that an actual suspension is required to protect the public or safeguard the public's confidence in the legal profession.*

(Emphasis added.)

**{¶ 40}** The primary purpose of our discipline process is not to punish the attorney who engaged in the misconduct but to protect the public. *Agopian*, 112 Ohio St.3d 103, 2006-Ohio-6510, 858 N.E.2d 368, at ¶ 10. In selecting a sanction, we consider the relevant factors, *Stark Cty. Bar Assn. v. Buttacavoli*, 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16, and weigh the aggravating and mitigating circumstances. *Disciplinary Counsel v. Broeren*, 115 Ohio St.3d 473, 2007-Ohio-5251, 875 N.E.2d 935, ¶ 21. But today, the majority's imposition of an actual term of suspension despite the significant differences between *Hartke* and this case seems more like punishment than an attempt to protect the public.

**{¶ 41}** Based on the striking differences between this case and *Hartke*—the lack of any direct coercion of a client, the fact that no portion of the fee was paid, and the length to which respondents have gone to mitigate the harm they caused—I do not believe that actual time out from the practice of law is needed to protect the public. However, because this case involves additional misconduct in the form

of an attempt to collect a clearly excessive fee, the length of the stayed suspension should be longer than that recommended by the board. Accordingly, I agree with the majority that a one-year suspension from the practice of law is the appropriate sanction for respondents' misconduct, but I would fully stay the suspension on the condition that they engage in no further misconduct. For this reason, I dissent.

DEWINE, J., concurs in the foregoing opinion.

––––––––––––––––––––––––––––

Joseph M. Caligiuri, Disciplinary Counsel, and Karen H. Osmond, Assistant Disciplinary Counsel, for relator.

Gallagher Sharp, L.L.P., Monica A. Sansalone, and Timothy T. Brick, for respondent Amaddio.

Coakley Lammert Co., L.P.A., George S. Coakley, and Richard T. Lobas, for respondent Wargo.

––––––––––––––––––––––––––––