**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as**
*Disciplinary Counsel v. Blakeslee***, Slip Opinion No. 2023-Ohio-4202.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

**Slip Opinion No. 2023-Ohio-4202**

**DISCIPLINARY COUNSEL *v*. BLAKESLEE.**

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Blakeslee*, Slip Opinion No. 2023-Ohio-4202.]**

*Attorneys—Misconduct—Violation of the Rules of Professional Conduct: engaging in conduct that adversely reflects on fitness to practice law—One-year suspension with six months conditionally stayed.*

(No. 2023-0741—Submitted July 18, 2023—Decided November 29, 2023.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2022-046.

_____

**Per Curiam.**

{¶ 1} Respondent, Jack Allen Blakeslee, of Caldwell, Ohio, Attorney Registration No. 0001005, was admitted to the practice of law in Ohio in 1976.[1] In a November 2022 complaint, relator, disciplinary counsel, charged Blakeslee with professional misconduct for throwing a feces-filled Pringles can into the parking lot of a victim-advocacy center involved in a capital-murder case in which Blakeslee was representing the defendant. Blakeslee waived a probable-cause determination and, in his answer, admitted many of relator's factual allegations and the single alleged rule violation. The parties also submitted joint stipulations of fact, misconduct, and aggravating and mitigating factors.

{¶ 2} After conducting a hearing, a panel of the Board of Professional Conduct issued a report finding by clear and convincing evidence that Blakeslee had committed the charged misconduct and recommending that we publicly reprimand him for that misconduct. The board adopted the panel's findings and recommendation. For the reasons that follow, we adopt the board's finding of misconduct but suspend Blakeslee from the practice of law for one year with six months stayed on the condition that he engage in no further misconduct.

## MISCONDUCT

{¶ 3} On June 1, 2021, Alexander Wells was indicted in the Guernsey County Court of Common Pleas for various offenses, including aggravated murder. *See State v. Wells*, Guernsey C.P. No. 21CR000088. The aggravated-murder offense included a specification that the victim was under the age of 13, making it a capital offense, *see* R.C. 2929.04(A)(9).

{¶ 4} On June 7, 2021, Blakeslee appeared at Wells's arraignment and was formally appointed by the court to represent him. Victim advocate Michelle

---

1. During his disciplinary hearing, Blakeslee testified that he is also admitted to practice in the United States Court of Appeals for the Sixth Circuit, the United States District Court for the Northern District of Ohio, and the United States Tax Court.

Carpenter Wilkinson,[2] whom had known Blakeslee professionally for many years, also attended Wells's arraignment. Blakeslee and Carpenter Wilkinson, who serves as chief executive officer of Haven of Hope, a victim-advocacy center in Cambridge, attended several additional court proceedings in the Wells case between June 11 and September 30, 2021.

{¶ 5} The trial court scheduled another pretrial hearing in Wells's case for November 30, 2021, at 8:30 a.m. Before leaving his home on the morning of that hearing, Blakeslee deposited his feces into an empty Pringles can. He then drove approximately 20 minutes from his home in Coal Ridge to Cambridge with the open can of feces. Between 8:10 and 8:15 a.m., Blakeslee turned his vehicle down an alley where the Haven of Hope parking lot is located, approximately two-tenths of a mile from the Guernsey County Common Pleas courthouse. A sign on the building at the entrance to the alley indicated "Haven of Hope Administrative Offices" above a bold arrow pointing down the alley. Surveillance video shows that Blakeslee slowed his vehicle as he initially passed Haven of Hope's parking lot. He continued driving further down the alley, passing several other parking lots, before turning around. He slowed again as he passed Haven of Hope's parking lot a second time, threw the Pringles can containing his feces into the lot, and then drove to the courthouse for the 8:30 a.m. pretrial hearing in Wells's case.

{¶ 6} Carpenter Wilkinson saw Blakeslee throw the can out his vehicle toward the Haven of Hope parking lot. After Blakeslee drove away, Carpenter Wilkson approached the item and discovered that it was a Pringles can containing what appeared to be human feces. She then left for the courthouse to attend Wells's

---

2. Throughout these proceedings, the parties and the board have identified the victim's advocate as Michelle Wilkinson or Michelle Wilkinson-Carpenter. We note, however, that in two documents in the record, she has identified herself as Michelle Carpenter Wilkinson, and we therefore refer to her by that name.

pretrial hearing. Upon arriving at the courthouse, she noticed that Blakeslee was also present for the hearing.[3]

**{¶ 7}** Later that day, after discussing the matter with a prosecutor assigned to the Wells case, Carpenter Wilkinson filed a report with the Cambridge Police Department. Thereafter, Blakeslee was charged with and pleaded guilty to minor-misdemeanor charges of disorderly conduct and littering. He ultimately paid $248 in fines and court costs for those offenses.

**{¶ 8}** During his disciplinary hearing, Blakeslee testified that he had engaged in similar misconduct on at least ten other occasions that year and that he randomly chose the locations where he deposited the Pringles cans containing his feces. He also specifically denied having any knowledge that the parking lot in question belonged to Haven of Hope when he threw the can from his vehicle on November 30, 2021.

**{¶ 9}** The parties stipulated and the board found that Blakeslee's conduct violated Prof.Cond.R. 8.4(h) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law).

**{¶ 10}** We adopt that finding of misconduct and expressly find that Blakeslee's conduct adversely reflects on his fitness to practice law even though that conduct is not expressly prohibited by another rule. *See Disciplinary Counsel v. Bricker*, 137 Ohio St.3d 35, 2013-Ohio-3998, 997 N.E.2d 500, ¶ 21 (holding that even when a lawyer's conduct is not specifically prohibited by the Rules of Professional Conduct, he may be found to have violated Prof.Cond.R. 8.4(h) if there is clear and convincing evidence that he engaged in misconduct that adversely reflects on his fitness to practice law).

---

3. In January 2022, the trial court granted Blakeslee's motion to withdraw from Wells's representation on the ground that he had previously represented three people identified as potential witnesses in the case.

**RECOMMENDED SANCTION**

**{¶ 11}** When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

**{¶ 12}** As for aggravating factors, the parties stipulated that Blakeslee had engaged in a pattern of misconduct, presumably based on his admission that he threw feces-filled Pringles cans from his vehicle on at least ten other occasions. *See* Gov.Bar R. V(13)(B)(3). The board disagreed, noting that "[a] 'pattern of misconduct,' is typically found where a respondent engages in multiple acts of misconduct, thus forming a pattern." Finding that this case involved just one rule violation arising from a single incident of misconduct—and that there was no evidence to establish the circumstances surrounding the additional instances of misconduct that Blakeslee had admitted in his testimony—the board rejected the parties' stipulated aggravating factor. We, however, accept the parties' stipulation that Blakeslee engaged in a pattern of misconduct. Regardless of whether Blakeslee randomly deposited the additional cans of feces or targeted particular locations or individuals, he freely admitted that he had engaged in similar acts of misconduct on multiple other occasions.

**{¶ 13}** As for mitigating factors, the parties stipulated to the absence of a prior disciplinary record, and the board found that Blakeslee has had a distinguished criminal-defense trial practice for more than four decades with no prior discipline. *See* Gov.Bar R. V(13)(C)(1). In addition, the parties stipulated and the board found that Blakeslee also had made full and free disclosure to the board and demonstrated a cooperative attitude toward the disciplinary proceedings, presented evidence of his good character and reputation, and had other penalties and sanctions imposed for his misconduct—namely, the nominal fines and court costs imposed for his misdemeanor convictions. *See* Gov.Bar R. V(13)(C)(4), (5), and (6). The board

also found that neither Wells nor Carpenter Wilkinson had been harmed by Blakeslee's actions.

{¶ 14} In addition, the board found that Blakeslee had accepted full responsibility for his actions, expressed genuine remorse, and testified that he is no longer engaging in the misconduct. Although Blakeslee testified that he was a Vietnam veteran and that he had received psychological treatment for posttraumatic stress disorder ("PTSD") related to his military service as well as child abuse, he did not seek to establish his disorder as a mitigating factor under Gov.Bar R. V(13)(C)(7).

{¶ 15} Blakeslee has described his misconduct as a "prank" and admitted that it was "stupid." He also acknowledged that he was embarrassed by the public revelation of his misconduct and the resulting media attention.

{¶ 16} Relator took the position that Blakeslee deposited the can of feces in the Haven of Hope parking lot with the intent of targeting Haven of Hope. In support of this position, relator relied on circumstantial evidence, including Blakeslee's 20-minute drive, the sign pointing toward access to Haven of Hope's office, Blakeslee's slow drive down the alley, and the fact that he went to court immediately after he deposited the can of feces to attend a hearing in the Wells case where Carpenter Wilkinson would be present. However, Blakeslee denied having any knowledge of Haven of Hope's location on November 30, 2021, and maintained that he had chosen all the locations for his deposits at random. The hearing panel and the board found Blakeslee's testimony to be credible and concluded that relator's position was not supported by clear and convincing evidence.

{¶ 17} During closing argument, relator argued that Blakeslee's misconduct warrants a conditionally stayed six-month suspension whereas Blakeslee suggested that a public reprimand would be appropriate. Both parties acknowledged that very

few, if any, prior cases offer guidance regarding the appropriate sanction for the misconduct at issue here.

{¶ 18} Relying primarily on *Columbus Bar Assn. v. Linnen*, 111 Ohio St.3d 507, 2006-Ohio-5480, 857 N.E.2d 539, *Butler Cty. Bar Assn. v. Blauvelt*, 160 Ohio St.3d 333, 2020-Ohio-3325, 156 N.E.3d 891, and the precept that the primary purpose of the disciplinary sanction is not to punish the offender but to protect the public, the board recommends that we publicly reprimand Blakeslee for his misconduct.

{¶ 19} Over a period of nearly two years, Linnen approached at least 30 different women throughout Franklin County wearing only athletic shoes and a stocking cap and photographed their reactions. *Linnen* at ¶ 3. He admitted that he would sometimes tap or pinch a victim's rear end to get her attention and that he may have masturbated in front of his first couple of victims. *Id*. Linnen pleaded guilty to 53 misdemeanor offenses—two first-degree misdemeanor counts of sexual imposition, one first-degree misdemeanor count of aggravated trespass, 11 third-degree misdemeanor counts of sexual imposition, and 39 fourth-degree misdemeanor counts of public indecency. *Id*. at ¶ 5. He was sentenced to 18 months of work release, fined $3,000, and ordered to continue counseling. *Id*. We found that Linnen violated professional-conduct rules prohibiting attorneys from engaging in illegal conduct involving moral turpitude and conduct that adversely reflects on a lawyer's fitness to practice. *Id*. at ¶ 21.

{¶ 20} In aggravation, we found that Linnen had engaged in a pattern of misconduct involving multiple offenses and that he had acted with a dishonest or selfish motive, the latter finding based on his testimony that the impetus for his crimes was "definitely an adrenalin[e] rush or euphoria * * * very much like a powerful drug." (Ellipsis sic.) *Id*. at ¶ 8. We also found that Linnen had failed to genuinely acknowledge the wrongful nature of his misconduct, focusing primarily on his own embarrassment and hardship rather than the harm he had caused to his

victims. *Id*. at ¶ 10, 23-24. In mitigation, Linnen had no prior disciplinary record, had cooperated completely in the disciplinary process, and had presented evidence of his good character. *Id*. at ¶ 18. We indefinitely suspended him for his misconduct. *Id*. at ¶ 33.

**{¶ 21}** In *Blauvelt*, 160 Ohio St.3d 333, 2020-Ohio-3325, 156 N.E.3d 891, the attorney was twice caught driving naked. The first time, he was stopped for a headlight violation and the officer observed he was naked but filed no charges against him. The second time, after receiving a report that a motorist was masturbating while driving, a state trooper stopped Blauvelt's vehicle and found him naked with pants covering his lap. Blauvelt was charged with public indecency and operating a vehicle while under the influence; he later pleaded guilty to public indecency and an amended charge of reckless operation of a vehicle. *Id*. at ¶ 7. He was sentenced to suspended jail terms and ordered to pay fines, complete a driver-intervention program, and serve a one-year term of nonreporting probation. *Id*.

**{¶ 22}** During Blauvelt's disciplinary proceedings, he acknowledged that he had driven while naked on other occasions without getting caught. *Id*. at ¶ 8. Aggravating factors consisted of a pattern of misconduct and submitting a false statement during a psychological evaluation conducted as part of the disciplinary process. *Id*. at ¶ 11. In mitigation, Blauvelt had a clean disciplinary record and had had a cooperative attitude toward the disciplinary proceedings, submitted evidence of his good character and reputation, and had other penalties imposed for some of his misconduct. *Id*. at ¶ 12. And in contrast to Linnen, Blauvelt expressed sincere remorse for his conduct, established the existence of a qualifying mental disorder, and did not appear to have targeted anyone with his conduct. *See id*. at ¶ 12-13, 18. We imposed a two-year suspension, stayed in its entirety on conditions focused on mental-health treatment, for Blauvelt's misconduct. *Id*. at ¶ 21. We later indefinitely suspended Blauvelt for continuing to engage in similar acts of

misconduct. *Butler Cty. Bar Assn. v. Blauvelt*, 168 Ohio St.3d 268, 2022-Ohio-2108, 198 N.E.3d 84.

{¶ 23} Here, the board found that Blakeslee's misconduct was less egregious than that of Blauvelt, in part because Blakeslee did not act with a sexual motivation. It also noted that the Supreme Court of Oklahoma recently disbarred an attorney who, among numerous other substantial violations, had issued to a client a refund check that was soiled with feces. *See State ex rel. Oklahoma Bar Assn. v. Bailey*, 2023 OK 34, 530 P.3d 24. The court found that whether Bailey's delivery of a soiled check was an intentional or an unintentional act, his conduct "is contrary to prescribed standards of conduct in our society where people recognize the potential harm from exposure to fecal matter, and also view its transfer from one to another as criminal in some circumstances." (Footnote omitted.) *Id*. at ¶ 45. The court determined that Bailey's delivery of the soiled check had been discussed in the media and brought discredit to the legal profession. *Id.* It therefore concluded that Bailey violated Rule 1.3 of the Oklahoma Rules Governing Disciplinary Proceedings, which provides that an attorney should not "act contrary to prescribed standards of conduct" when the act "would reasonably be found to bring discredit upon the legal profession." *Bailey* at ¶ 45.

{¶ 24} Ohio has no comparable rule. However, the evidence in this case shows that despite societal standards of cleanliness and decorum, Blakeslee failed to control his own bizarre impulses to place feces-filled cans out in public for unsuspecting people to find. His aberrant conduct has adversely reflected on his own fitness to practice law and brought discredit to the profession through significant media attention.

{¶ 25} We typically defer to a hearing panel's credibility determinations unless the record weighs heavily against those findings, inasmuch as the panel members had the opportunity to see and hear the witnesses firsthand. *Cincinnati Bar Assn. v. Statzer*, 101 Ohio St.3d 14, 2003-Ohio-6649, 800 N.E.2d 1117, ¶ 8.

Although Blakeslee testified that he randomly selected all the locations in which he deposited his feces-filled cans, the circumstantial evidence in the record weighs heavily against his testimony that he randomly chose the Haven of Hope parking lot as his drop zone on November 30, 2021.

{¶ 26} The board found that Blakeslee had known Carpenter Wilkinson professionally for many years. In fact, Blakeslee testified that he had known her for 20 years and that she had been a victim's advocate at Haven of Hope for as long as he had known her. In addition to their association through Haven of Hope, Blakeslee stated that he and Carpenter Wilkinson were friends on Facebook and that he had represented her daughter in a legal matter. He also testified that he knew everyone at Haven of Hope and indicated, during his deposition testimony, that he "deal[t] with them on a daily basis." Despite his close and long-term working relationship with Carpenter Wilkinson and her colleagues, Blakeslee maintained that he had had no knowledge of where their administrative office was located.

{¶ 27} In his deposition testimony, Blakeslee claimed that "[i]t was an indiscriminate choice," that he "had no plans to throw that thing in Cambridge" that morning, and that "[i]t just so happened that [he] did." He also claimed, "I didn't pick the spot. It was just on the way down that alley." But at his disciplinary hearing, he testified that when he engages in this behavior, he routinely disposes of the can "on the way to work."

{¶ 28} On the day in question, Blakeslee was headed to the Guernsey County courthouse for Wells's hearing. He was likely to see Carpenter Wilkinson there because she had attended most of the previous hearings in that case. He drove for approximately 20 minutes from his home to Cambridge with the open can of feces in his car without previously disposing of the can somewhere else.

{¶ 29} Blakeslee can be seen on surveillance video turning his vehicle down the alley where Haven of Hope's administrative office is located, approximately

two-tenths of a mile from the courthouse. Video from other cameras in the alley show him slow down as he passed the Haven of Hope parking lot and then speed up. The video also shows him turn around in another parking lot to take a second pass down the alley in the opposite direction. Once again, he slowed his car as he passed the Haven of Hope parking lot—only that time, he tossed the Pringles can out the window before speeding up and driving away. Another video shows Blakeslee exiting the alley at approximately 8:14 a.m. and driving toward the courthouse. Video from the courthouse shows him entering the building just a few minutes later.

{¶ 30} Although Blakeslee claimed that he had "no specific targets" and engaged in "random incidents" when previously engaging in this type of misconduct, he also stated that before this incident, he usually would throw the can in the street. He explained during his deposition and hearing testimony that he threw the feces-filled cans "to blo[w] off steam" and that he "got a kick out of it," imagining the "look of surprise" on peoples' faces when they would find them. Blakeslee's statement that "[i]t was kind of like a release" suggests that like Linnen, he engaged in aberrant conduct to seek an adrenaline rush or thrill. *See Linnen*, 111 Ohio St.3d 507, 2006-Ohio-5480, 857 N.E.2d 539, at ¶ 8.

{¶ 31} These facts weigh heavily against Blakeslee's testimony that the location of his November 30, 2021 deposit was random or coincidental. Rather, they present clear and convincing evidence not only that he intentionally selected that location but also that he escalated a preexisting pattern of conduct to seek an even greater thrill by pulling his prank on someone he knew—be it Carpenter Wilkinson or one of her colleagues—just minutes before he would see one of them in court. Although Blakeslee maintained throughout his disciplinary proceeding that his misconduct had nothing to do with his PTSD, he agreed during his deposition that the misconduct was not normal and stated, "There has to be something going on that's related to some of the things I went through in early life."

And during his disciplinary hearing, he suggested that his misconduct may be a "protest of some kind." But when asked what he was protesting, he responded somewhat evasively, stating, "Well, we all protest something."

{¶ 32} In this case—as in *Blauvelt* and *Linnen* before it—we are dealing with admittedly bizarre behavior that falls far short of the standard of conduct expected of lawyers and tends to bring the legal profession into disrepute. Each of the three cases presents unique facts. *Linnen* involved criminal conduct that consisted of accosting numerous female victims (sometimes touching them) and violating them by photographing their reactions to his indecent exposure. Blauvelt's conduct, while inappropriate and disreputable, did not target particular victims or cause them harm. Because we find that Blakeslee's misconduct was directed at Carpenter Wilkinson and her colleagues, we also find that it has implicated his professional life in a way that neither Blauvelt's nor Linnen's did. And for those reasons, we find that the severity of Blakeslee's misconduct falls somewhere between that of Blauvelt and Linnen.

{¶ 33} We acknowledge that Blakeslee does not appear to have harbored any animosity toward Carpenter Wilkinson, her colleagues, or their work as victim's advocates. Nor did he intend to intimidate them. While the record demonstrates that Blakeslee regrets his misconduct, it also shows that he lacks sufficient insight into the origin of and motivation for his inappropriate behavior to effectuate positive change. We therefore reject the board's assessment that there is no factual basis for concluding that the public needs to be protected from additional violations, and we conclude that the appropriate sanction for Blakeslee's misconduct is a one-year suspension with six months stayed on the condition that he engage in no further misconduct.

## CONCLUSION

{¶ 34} Accordingly, Jack Allen Blakeslee is suspended from the practice of law in Ohio for one year with six months stayed on the condition that he engage in

12

no further misconduct.  If Blakeslee fails to comply with the condition of the stay, the stay will be lifted and he will serve the entire one-year suspension.  Costs are taxed to Blakeslee.

Judgment accordingly.

KENNEDY, C.J., and DONNELLY, STEWART, and DETERS, JJ., concur.

DEWINE, J., concurs in judgment only.

FISCHER, J., concurs in part and dissents in part and would impose a two-year suspension, all stayed, and two years of probation.

BRUNNER, J., not participating.

————————

Joseph M. Caligiuri, Disciplinary Counsel, for relator.

Charles J. Kettlewell, L.L.C., and Charles J. Kettlewell, for respondent.

————————